WILLIAM RASH, *Admr.* v. NORFOLK & WESTERN RAILWAY COMPANY

(No. 8769)

Submitted October 4, 1938. Decided November 1, 1938.

*W. W. Coxe, A. W. Reynolds* and *Sanders & Day,* for plaintiff in error.

*Lilly & Lilly* and *James S. Kahle,* for defendant in error.

Fox, Judge:

This action was instituted in the circuit court of Mercer County under the Federal Employers' Liability Act by William Rash, administrator of the estate of Noah Trump, against the Norfolk & Western Railway Company on account of the death of the decedent, Trump, on the 10th day of March, 1937, and resulted in a verdict in favor of the plaintiff for the sum of $12,000.00. The motion to set aside the verdict was overruled and judgment entered thereon, to which action of the court the railway company prosecutes this writ of error.

Plaintiff's decedent was employed by the railway company as a section man in a crew of which his father was the foreman. They congregated at Ada, a station a short distance east of Bluefield, about seven-thirty A. M. on the date of decedent's death. The work which had been laid out for them on that day was the repair of a track some eight or ten miles east of Ada at a point near what is called in the record "MacKenzie's Siding", between which point and east to Roanoke, Virginia, the defendant operates a double track railway. The evidence discloses that it was customary to transport section men to their place of labor by the use of a motor-propelled car, and before placing this car on the track, they were required to ascertain the traffic movements on the railway, referred to as the "lay-out". Two section crews met at Ada on the morning of the 10th, and the foreman of one of them, a Mr. Pennington, inquired of the station agent what the "lay-out" was, and was advised that train Number 15, a fast passenger train coming from the east, was about on time, and that further information could be obtained at Blake tower, some five miles east of Ada. Immediately after an east-bound freight train passed Ada, the motor cars, operated by foreman S. J. Trump, and Pennington, were put on the east-bound track, that being the track over which trains traveled east, and moved over this track to Blake tower, where Trump inquired of the operator at that point as to train movements, and was told that no trains would pass on the west-bound track before 10 A. M. that day. These statements with reference to train movements both at Ada and at Blake tower were made in the presence of the crew of which S. J. Trump was the foreman, and including Noah Trump. Strange as it may appear, the fact that the fast passenger train Number 15, which that morning was running about seventeen minutes late, had not passed Blake tower at the time inquiry was made as to the movement of trains, seems to have been overlooked, as stated by several witnesses, including section foreman Trump, who testified that the trains they had

in mind when making inquiries at Blake tower were freight trains and that passenger train Number 15 had been forgotten by them. Immediately thereafter, the motor car was moved to MacKenzie's Siding, where it was transferred from the east-bound track to the west-bound track, and the car then proceeded in an easterly direction and in face of west-bound traffic. The car had moved some two thousand feet east from MacKenzie's Siding when, looking ahead, the five men occupying the motor car noticed smoke from a locomotive which apparently was pulling a train up-grade and in a westerly direction. On the motor car at that time were S. J. Trump, the foreman of the crew, Noah Trump, his son, L. M. Doby, I. N. Wimmer and C. G. Dooley. S. J. Trump immediately stopped the car. Doby jumped from the car, a flag was thrown to him and he proceeded on the track east in an attempt to warn the on-coming train. Section foreman Trump reversed the motor car and directed the other men to get off the car. The car started moving west and two of the men remaining thereon, Wimmer and Dooley, jumped therefrom to the side of the track, alighting in safety and on their feet. S. J. Trump remained on the motor car until he saw that he would be unable to outrun the on-coming train, and he too jumped from the car, after cutting off the motor and setting the brakes; but for some unaccountable reason, Noah Trump remained on the car, which was struck by the locomotive, resulting in Trump's being thrown from the car, causing injuries from which he died a few hours later. Doby had given a signal calling for a "service" application of brakes and the gradual slowing of the train, maintaining this signal until it was answered by two blasts of the locomotive whistle, whereupon he had given what is known as the "wash-out" signal, which calls for emergency efforts to stop the train. At the time this "wash-out" signal was given, the locomotive had about reached the point where Doby was standing. An emergency application of brakes was made and the train's speed further reduced, but not sufficiently to pre-

vent its striking the motor car, and it ran about 175 feet beyond the point of collision. The train was running on a sharp left curve, and the engineer was not able to see the flag until close upon the point where the flagman stood; but the fireman, on account of his location in the engine cab, saw the flagman earlier and promptly notified the engineer. The train was running up-grade at a speed of about forty miles per hour when the signal was first seen, and the testimony of the trainmen is to the effect that they did all that could be done under the circumstances to avoid the accident, although the evidence is not without conflict as to what could have been done in reducing the speed of the train. There is also evidence tending to show that had the motor car been operated by the section foreman in a proper manner after its gears were reversed, its speed could have been increased, with a possibility that by a combination of lessening the speed of the train and increasing that of the motor car, the accident might have been avoided.

The negligence of the railway company, growing out of the fact that its section foreman overlooked the running of the west-bound train Number 15, is conceded in defendant's Instruction No. 2, and the plaintiff below contends that the company was also negligent in ordering the section men to operate the motor car on the west-bound track; in the operation of train Number 15; the use of the flag; in the operation of the motor car after the approach of the train was discovered; that such negligence was the proximate cause of the injury and death of Noah Trump; and that the company is liable therefor.

The railway company, while admitting negligence to the extent mentioned above, assigns the following grounds of error upon which it bases its contention that the verdict should be set aside: (1) That the plaintiff's decedent, Noah Trump, under the circumstances of the case, assumed the risk of injury as a matter of law; (2) that the negligence of Noah Trump after the approach of the train was discovered was the sole proximate cause of the accident resulting in his death; (3) that at the

least, Noah Trump was guilty of contributory negligence as a matter of law, which the jury should have considered in diminution of damages, and that such negligence was not taken into consideration by the jury in arriving at its verdict; and (4) that the verdict should have been set aside on account of certain remarks of plaintiff's counsel in the closing argument to the jury, and in support of this assignment, there appears in the record a verbatim report of the argument complained of.

The railway company was, admittedly, guilty of negligence in overlooking the running of train Number 15 on its west-bound track, and in placing the motor car on said track, ordering the section men to man it, and operating the same in the face of westbound traffic; whether or not it was also guilty of continued acts of negligence in the operation of said train after the flag was first seen by the fireman, in the use of the flag, and in the operation of the motor car by foreman Trump, was a jury question, and on that question, the jury presumably found for the plaintiff. The decisive question is whether, accepting this finding of negligence, the death of plaintiff's decedent was the inescapable result thereof; or was it the result of an assumption of a known and obvious risk on his part which he could have avoided.

The issue, thus limited, is not one requiring extended discussion or the citation of authority. We have studied the numerous cases cited by counsel for both the plaintiff and defendant in error on the subject of assumption of risk. Few of them are applicable to the case at bar. For the most part they bear upon the general risks of employment, risks not assumed except where fully realized, and kindred subjects. Here, the question of general risks of employment is not involved, and the case rests upon a special state of facts to which we must apply well settled principles of law. In *Shifflett* v. *Western Md. Ry. Co.*, 119 W. Va. 676, 195 S. E. 849, we discussed the question of assumption of risk in cases tried under the Federal Employers' Liability Act, referring to numerous cases, many of which are cited in the briefs filed

herein. Suffice it to say that, under the authorities, as we interpret them, the case at bar is not one in which it can be said that there was an assumption of risk, unless it be that assumed by plaintiff's decedent, when, after the approach of train Number 15 was discovered, and after he had been ordered by his foreman to leave the motor car and had ample time and opportunity to do so with safety, he, in face of the perfectly obvious danger approaching, remained on the motor car until the same was struck by the train operated by the railway company.

There is no conflict of testimony as to the actions of the decedent throughout the day of his death. There is no convincing evidence that he was other than a normal person. He assisted in the placing of the motor car on the west-bound track and was, apparently, capable of performing his usual labors. The evidence tending to show that he was not at all times in robust health is not sufficient to excuse or explain his failure to take ordinary precautions for his own safety. On the other hand, there is positive evidence coming from four witnesses, including the father of the decedent, showing that the approach of train Number 15 was discovered when it was approximately one-half mile away; that the motor car was stopped; that the men riding thereon were ordered by the foreman to leave the car; that one of these men jumped from the car and attempted to flag the approaching train; that the foreman on the motor car reversed its gears and the car started to move backward away from the approaching train; that two of the three section men, not counting the foreman, remaining on the car then jumped therefrom to the side of the track, landing in safety and on their feet; that still later the foreman, seeing that the train would overtake the motor car, left the same; and yet the plaintiff's decedent did not move from his position on the car and by reason thereof lost his life. His conduct cannot be explained. He had ample time to make up his mind and act thereon. Every other man on the motor car did so, and there is nothing in the record from which can reasonably be in-

ferred that the decedent could not have done so. It is estimated that forty seconds passed from the time the approach of the train was discovered until the motor car was struck. We are apt to think of seconds as hardly to be reckoned with in the passing of time, yet a train running at a speed of forty miles per hour will cover a distance of approximately one-half mile in that period; we can easily gauge what can be done in that length of time, and still more important in this case is what the other occupants of the motor car actually did. The time involved was, in one sense, short; in another sense, it was ample to take the situation out of the status of an emergency wherein it might be said there was not sufficient time for the decedent to become cognizant of his danger and make use of the faculties of mind necessary to the assumption of a risk. We are unable to escape the conclusion, and we find that the decedent was bound to understand and appreciate the risk of an obvious and known danger at a time when he could have safely avoided the same, and thereby assumed such risk as a matter of law, and that his assumption of risk was the sole proximate cause of the injury from which his death resulted. So holding, it follows that there cannot be a recovery upon the record presented.

Our decision calls for a new trial of this case, and in view of this fact, we deem it advisable to comment on the closing argument of counsel for the defendant in error. The argument referred to was apparently deliberate, and was an able and adroit use of extraneous matters tending strongly to inflame the minds of the jurors, and well calculated to bring about a verdict based on passion and prejudice. No authority is needed to support the assertion that a verdict so reached cannot stand. The verdict being set aside on other grounds, it is unnecessary to gauge the effect of the argument, as it relates to the verdict returned, but this much seems clear: the argument complained of was made in the face of rulings of the trial court, as evidenced by its action on statements made therein, to which an objection was sus-

tained; these rulings were, in effect, ignored by counsel, and accompanied by his repeated invitations to opposing counsel to object, amounting to open defiance of the efforts of the court to confine the argument to the merits of the case. Under the circumstances, it was the duty of the court to use the authority vested in it to hold the argument of counsel within due bounds. It was not justified in permitting the continuance of an argument which might have resulted in a verdict, rendered through passion and prejudice which, under the law, could not have been upheld. Much latitude is allowed counsel in argument, and generally courts are warranted in relying upon opposing counsel to protect the interests of their clients by objections; but the disadvantage under which objecting counsel labor in such circumstances should not be overlooked by a trial court, and the failure of counsel to object should not deter the court from assuming such control of a case as may be necessary to insure orderly procedure confined to the merits of the controversy being tried. It is unnecessary in this case to pass upon the question of whether by failing to object to the argument in question at the time, or in failing to move for a mistrial at the conclusion thereof, plaintiff in error waived its right to raise the question in this court. Ordinarily such objection or motion is required. It is sufficient to say that under the circumstances of this case the trial court would have been well within its prerogatives and powers had it enforced its ruling against the character of argument complained of, and should have done so. These views are expressed for the guidance of counsel and trial courts, and should they be ignored, this court is not without power to enforce them.

The judgment of the circuit court is reversed, the verdict set aside, and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*