WILLIAM RASH, *Administrator, v.* NORFOLK & WESTERN
RAILWAY COMPANY

(No. 9058)

Submitted September 24, 1940.  Decided December 10, 1940.

W. W. *Coxe, Sanders & Day* and *A. W. Reynolds*, for plaintiff in error.

*Lilly & Lilly* and *James S. Kahle,* for defendant in error.

RILEY, PRESIDENT:

William Rash, administrator of the estate of Noah Trump, instituted this action in the Circuit Court of Mercer County under the Federal Employers' Liability Act to recover damages for the alleged death of decedent. Defendant prosecutes this writ of error to a judgment against it in the amount of $7,000.00 based upon a jury verdict.

This action was tried twice. On writ of error to this Court, the judgment rendered on the first trial was reversed, the verdict set aside, and the case remanded for a new trial. See *Rash, Adm'r.* v. *Norfolk & Western Railway Co.,* 120 W. Va. 540, 200 S. E. 583. Except for additional evidence introduced by both plaintiff and defendant, the evidence introduced on the instant trial of this case is substantially the same as that introduced at the first trial.

For convenience that part of the statement of facts contained in the opinion rendered on the first writ of error, which is supported by the instant record, will be stated verbatim as follows:

"Plaintiff's decedent was employed by the railway company as a section man in a crew of which his father was the foreman. They congregated at Ada, a station a short distance east of Bluefield, about seven-thirty A. M., on the date of decedent's death. The work which had been laid out for them on that day was the repair of a

track some eight or ten miles east of Ada at a point near what is called in the record 'MacKenzie's Siding', between which point and east to Roanoke, Virginia, the defendant operates a double track railway. The evidence discloses that it was customary to transport section men to their place of labor by the use of a motor-propelled car, and before placing this car on the track, they were required to ascertain the traffic movements on the railway, referred to as the 'layout'. Two section crews met at Ada on the morning of the 10th, and the foreman of one of them, a Mr. Pennington, inquired of the station agent what the 'lay-out' was, and was advised that train Number 15, a fast passenger train coming from the east, was about on time, and that further information could be obtained at Blake tower, some five miles east of Ada. Immediately after an east-bound freight train passed Ada, the motor cars, operated by foreman S. J. Trump, and Pennington, were put on the east-bound track, that being the track over which trains traveled east, and moved over this track to Blake tower, where Trump inquired of the operator at that point as to train movements, and was told that no trains would pass on the west-bound track before 10 A. M. that day. These statements with reference to train movements both at Ada and at Blake tower were made in the presence of the crew of which S. J. Trump was the foreman, and including Noah Trump. Strange as it may appear, the fact that the fast passenger train Number 15, which that morning was running about seventeen minutes late, had not passed Blake tower at the time inquiry was made as to the movement of trains, seems to have been overlooked, as stated by several witnesses, including section foreman Trump, who testified that the trains they had in mind when making inquiries at Blake tower were freight trains and that passenger train Number 15 had been forgotten by them. Immediately thereafter, the motor car was moved to MacKenzie's Siding, where it was transferred from the east-bound track to the west-bound track, and the car then proceeded in an easterly direction and in face of west-bound traffic. The car had moved some two thousand feet east from

MacKenzie's Siding when, looking ahead, the five men occupying the motor car noticed smoke from a locomotive which apparently was pulling a train up-grade and in a westerly direction. On the motor car at that time were S. J. Trump, the foreman of the crew, Noah Trump, his son, L. M. Doby, I. N. Wimmer and C. G. Dooley. S. J. Trump immediately stopped the car. Doby jumped from the car, a flag was thrown to him and he proceeded on the tract east in an attempt to warn the on-coming train. Section foreman Trump reversed the motor car and directed the other men to get off the car. The car started moving west and two of the men remaining thereon, Wimmer and Dooley, jumped therefrom to the side of the track, alighting in safety and on their feet. S. J. Trump remained on the motor car until he saw that he would be unable to outrun the on-coming train, and he too jumped from the car, after cutting off the motor and setting the brakes; but for some unaccountable reason, Noah Trump remained on the car, which was struck by the locomotive, resulting in Trump's being thrown from the car, causing injuries from which he died a few hours later. Doby had given a signal calling for a 'service' application of brakes and the gradual slowing of the train, maintaining this signal until it was answered by two blasts of the locomotive whistle, whereupon he had given what is known as the 'wash-out' signal, which calls for emergency efforts to stop the train. At the time this 'wash-out' signal was given, the locomotive had about reached the point where Doby was standing. An emergency application of brakes was made and the train's speed further reduced, but not sufficiently to prevent its striking the motor car, and it ran about 175 feet beyond the point of collision. The train was running on a sharp left curve, and the engineer was not able to see the flag until close upon the point where the flagman stood; but the fireman, on account of his location in the engine cab, saw the flagman earlier and promptly notified the engineer. The train was running up-grade at a speed of about forty miles per hour when the signal was first seen, and the testimony of the trainmen is to the effect that they did all that could be

done under the circumstances to avoid the accident, although the evidence is not without conflict as to what could have been done in reducing the speed of the train."

On the first writ of error we held that under the foregoing statement of facts, the railway company was guilty of negligence in overlooking the running of Train Number 15 on its westbound track, and in placing the motor car on that track and ordering its operation in the face of oncoming traffic, and that it was a jury question whether or not thé railway company was also guilty of negligence in the operation of the train after the flag was first seen by the fireman, in the use of the flag and in the operation of the motor car by the foreman Trump. So far as the evidence contained in the instant record conforms with that adduced on the first trial, our former holding on the question of the railway company's negligence is the law of the case, and this case not being within the exception stated in *Pennington* v. *Gillaspie,* 66 W. Va. 643, 66 S. E. 1009, the former holding is binding on us on this writ of error. *Atwater & Co., Inc.,* v. *Fall River Pocahontas Collieries Co. et al.,* 119 W. Va. 549, 195 S. E. 99; *White* v. *Lazelle, Judge,* 99 W. Va. 109, 128 S. E. 303; *Butler* v. *Thompson,* 52 W. Va. 311, 314, 43 S. E. 174; 5 Corpus Juris, Secundum, Appeal and Error, Sections 1499 and 1964.

Defendant's counsel tacitly admit that defendant was guilty of negligence in the particulars heretofore suggested, but assign three grounds of error, none of which bears upon the railway company's negligence: (1) That Noah Trump assumed the risk of injury as a matter of law; (2) that the negligence of Noah Trump after the approach of the train was discovered and the motor car started to back, was the sole proximate cause of the accident which resulted in his death; and (3) improper evidence was admitted over defendant's objection. In appraising these three assignments of error, let us at this point consider the additional evidence offered by the plaintiff in an apparent effort to take this case out of the

scope of our former holding. The additional evidence which bears upon the assignments of error may be classified, first, evidence tending to show that the motor car after being reversed was negligently operated; second, evidence to the effect that the decedent was not a "normal person"; and, third, answers given to hypothetical questions which sought to elicit from expert witnesses the reasons why decedent did not remove himself from the motor car as the oncoming train was approaching.

The additional evidence to the effect that the operation of the motor car in reverse was negligent is indeed convincing. Samuel A. Cale, who for seventeen years had been the motor car supervisor of The Virginian Railway, and for that period of time had known and worked on motor cars of the type upon which decedent was killed, testified that a motor car of the type under consideration had five gears forward and reverse, and that such a car could be brought from a rest position to a speed of forty miles an hour within a distance of one hundred feet. S. J. Trump, the section foreman, testified that the frost which was on the tract on the day of the accident did not interfere with the operation of the motor car; that after he stopped the car and placed the motor in reverse gear he did not change to any higher gear; that, in answer to one question, the car was driven in reverse in low gear; and that he operated the car in reverse at a speed not in excess of ten miles an hour, and did not know whether the car, if its motor had been placed in a higher gear, could have outrun the train. The evidence further shows that at no time while being driven in reverse did the motor car exceed the speed of ten miles an hour, notwithstanding, that from the time the car started to back until it was struck by defendant's engine, it had traversed a distance of 440.5 feet. Thus, by simple calculation it may be readily seen that if the motor car's speed had been raised to 14 1/3 miles per hour, it would have outrun the train. This additional evidence possibly would be decisive of this case if the last clear chance doctrine were under consideration. However, this action

was instituted as heretofore stated under the Federal Employer's Liability Act, 45 U. S. C. A., Sections 51-59. In an action against a common carrier, under the provisions of the foregoing act, brought to recover damages for an employee's death, in a case in which the carrier violated no statute enacted for the safety of employees which contributed to such employee's death, the fact that the employee may have been guilty of contributory negligence does not bar recovery, but simply devolves upon the jury the duty to diminish damages in proportion of the negligence attributable to such employee. Of course, the last clear chance doctrine is never available unless there is evidence which shows or tends to show that the person for whose benefit the doctrine is invoked was guilty of contributory negligence.

In the former opinion, written by Judge Fox, it was stated: "There is no convincing evidence that he (decedent) was other than a normal person." This statement, though perhaps not necessary for the decision, was made for the purpose of indicating that decedent was of such mind and body that he was able to assume the risk, when, having been directed by the section foreman to leave the motor car, he elected to remain thereon. Evidently relying upon this statement in the former opinion, plaintiff's counsel undertook on the retrial to establish that decedent was, in fact, a person below normal alertness or intelligence and by the opinion testimony of psychologists and physicians counsel sought to show that because of decedent's condition he was unable to remove himself from the motor car. The evidence to the effect that decedent was unable to leave the motor car before it was struck by the oncoming train because of his physical and mental condition is unconvincing. Noah Trump's father testified that decedent was a normal person and many witnesses introduced by defendant, including storekeepers with whom decedent had dealt, fellow Sunday School and church members, ministers of the church which decedent attended, and fellow-workmen testified that he was a normal person; that he could drive an automobile well;

that as secretary of the Sunday School he made reports and had charge of the monies; and that during the course of his work he was able to work well and remove himself from the danger of oncoming trains. But on the basis principally of Dr. Horton's testimony to the effect that decedent was slow physically and mentally, plaintiff's counsel by hypothetical questions addressed to physicians, including a psychiatrist, and a non-medical psychologist, elicited opinions, based upon an assumption of fact to the effect that decedent could not remove himself from the motor car because of his physical and mental condition. This testimony is indeed of little value, especially in view of the fact that there was no evidence to the effect that decedent was a moron or a person mentally incompetent.

Of course, if decedent had been a person of such low mentality that he could not perform his work with comparative safety to himself and could not comprehend his inability and the defendant had knowledge thereof, an entirely different case would be presented to us which would merit a holding in plaintiff's favor. Where, as here, an employee knows, or should know, of his own limitations, but nevertheless accepts hazardous employment, he does so at the risk of any injury that may result from such limitations, whether they be mental or physical. Any other rule would not conserve the ends of efficiency in modern industry. "So far as their own safety is concerned, persons not under contractual disability should be, and are allowed to determine for themselves whether their physical infirmities, known to themselves, shall debar them from any particular employment. According to the nature and degree of their infirmities, they must be more or less exposed to dangers, naturally resulting from their attempt to serve, in almost any of the modern industries. It is no doubt a hard choice, but such persons must estimate for themselves the chances of injury, and it would be unjust as well as illogical to visit the consequences of their choice upon their employers." *Tennessee Coal, Iron & R. Company* v. *Moody,* 192 Ala. 364, 68 So. 274, L. R. A. 1915 E. 369. See also *Huber* v. *Jackson & S.*

Co., 1 Marv. (Del.), 374, 41 Atl. 92, 13 Am. Neg. Cas. 766; *Phillips* v. *Pilot,* 82 Fed. 111.

Under the circumstances, we think that the evidence bearing on decedent's mental and physical condition, as a matter of law, does not show that decedent in remaining on the car, after he had been instructed and had the opportunity to leave, did not assume the risk of remaining. This case, like the former, justifies a holding that decedent when he failed to leave the car, having been warned and instructed to do so by the section foreman, assumed the risk of remaining, and therefore, under the state of the present record, his administrator is precluded from recovery.

For the foregoing reasons, the judgment of the trial court is reversed, the verdict set aside and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*

HATCHER, JUDGE, dissenting:

A risk is assumed only when its danger is fully appreciated. That Noah Trump should deliberately remain on the motor car, understanding that its low speed of only ten miles per hour would not be accelerated, and that unless so, it would necessarily be overrun by the train, does not seem natural. A far better solution, to my mind, is that since Noah was not facing his father, Noah did not hear his father's only admonition, given after he had first reversed the car, "Boys you'd better get off", and remained on the car, expecting its speed to be raised—in manner stated in the majority opinion—and thus have it run away from the train. A fellow workman on the car testified that this was his notion, until the train had almost overtaken the car; so this theory is not at all strained. It seems to me that at any rate the solution of his conduct is a jury question. Furthermore, the former opinion says: "* * * for some unaccountable reason Noah Trump remained on the car * * *." This statement is copied into

the present opinion. I respectfully submit it is not logical to hold that Noah assumed the risk, if his reason for remaining on the car is *unaccountable*.