STATE *ex rel.* ROY H. ADKINS, *Admr., etc.*

*v.*

EDGAR B. SIMS, *Auditor, etc.*

(No. 9954)

STATE *ex rel.* J. P. BURGESS, *Admr., etc.*

*v.*

EDGAR B. SIMS, *Auditor, etc.*

(No. 9958)

STATE *ex rel.* C. J. JONES, *Admr., etc.*

*v.*

EDGAR B. SIMS, *Auditor, etc.*

(No. 9959)

STATE *ex rel.* JOE SURBER, *Admr., etc.*

*v.*

EDGAR B. SIMS, *Auditor, etc.*

(No. 9960)

646

STATE *ex rel.* EDWARD D. BURDETTE, *Admr., etc.*

*v.*

EDGAR B. SIMS, *Auditor, etc.*

(No. 9961)

STATE *ex rel.* E. W. LIVELY, *Admr., etc.*

*v.*

EDGAR B. SIMS, *Auditor, etc.*

(No. 9962)

*T. C. Townsend* and *M. E. Boiarsky,* and *Myron R. Renick,* for relators.

*Ira J. Partlow,* Attorney General, and *Eston B. Stephenson* and *W. Bryan Spillers,* Assistant Attorneys General, for respondent.

Fox, PRESIDENT:

On the night of January 26, 1940, the decedents of the several relators in the above-styled proceedings were killed when the automobile in which they were riding went over a precipitous bank near the hard-surfaced state primary highway, known and designated as State Route No. 61, leading from Deepwater to Oak Hill, in Fayette County. No person now living saw the accident.

Some time after the death of the decedents, their several administrators, relators herein, filed with the State Court of Claims separate claims each for the sum of ten thousand dollars, basing their claims on the alleged negligence of the state road commissioner in failing to keep the highway aforesaid in a safe condition for travel, and specifically the failure of the state road commissioner to install and maintain guard rails, road markers, and painted center lines, for the protection and guidance of persons using the highway. In the year 1943, the Court of Claims, one Judge dissenting, recommended to the Legislature the payment of thirty-five hundred dollars to each of the claimants, the opinion and recommendation of the Court of Claims being made a part of the record before us, and at the Regular Session of the Legislature, 1945, an appropriation for twenty-one thousand dollars to pay the claim so recommended by the Court of Claims was included in the general budget bill enacted at that session.

There are no disputed facts in the proceedings before us. Admittedly, there was no guard rail at the point of the accident; no road markers, and no painted center line on the paved surface of the highway. On the other hand, there is no showing that the highway was otherwise in an unsafe condition. The paved portion of the highway

was fourteen feet in width, and the width of the berm varied from six and one-half feet to three feet at the narrowest point and where the automobile left the highway. While neither the State Court of Claims nor the Legislature refers to the existence of a moral obligation of the State to compensate the estates of the victims of this distressing accident, it is assumed that such supposed obligation was in the minds of both, inasmuch as the State has constitutional immunity (Section 35 of Article VI of the Constitution) from a suit or action on a claim of this character.

When the claims aforesaid were presented to the Auditor of the State of West Virginia, respondent herein, in the year 1945, payment was refused, on the general ground that the Legislature was without constitutional power to make the appropriation aforesaid for their payment, and on specific grounds not now important. The action of the Auditor was taken under the provisions of Code, 12-3-1.

Following this action on the part of the auditor, one of the relators herein, Roy H. Adkins, administrator of the personal estate of Roy Herbert Adkins, deceased, sought, in this Court, a writ of mandamus against Edgar B. Sims, Auditor, to compel the issuance by him of a warrant on the state treasurer for payment of his claim, so recommended by the Court of Claims, and appropriated for by the Legislature. The other claims of like nature, five in number, were only incidentally mentioned. We awarded the rule in mandamus prayed for and heard the case on its merits. The writ was denied by a unanimous Court, but there was disagreement as to the basis on which the decision should rest. A majority of the Court based its opinion on the disputed question on the following statement in the opinion prepared by Judge Kenna:

> "Returning to what we regard as the question upon which the decision here turns and not attempting to dispose of a number of the questions briefed and argued because, in our opinion, they are not relevant, we believe the question of whether the Legislature has declared this claim

to be a moral obligation of the State of West Virginia is decisive. The Legislature has not so stated unless placing the item in the Budget Bill can be so applied. The wording of the bill in that regard is as follows: 'Adkins, Roy H., Admr. of Estate of Roy Herbert Adkins, Jr., deceased—$3,500.00.' The Legislature did not express its judgment concerning the existence of a moral obligation on the part of the State, either in the affirmative or negative, unless that is a matter that may be arrived at by implication from the fact that it did appropriate. We think that the statement of the question of whether a moral obligation of the State may be acknowledged indirectly requires no discussion, but that necessarily a declaration of that consequence requires a distinct and express enactment based upon its own conclusion of fact, stated by the Legislature preferably in an enactment separate and distinct from the appropriation bill that carries the grant."

Two members of the Court, while concurring in the holding quoted above, would also have denied the writ on the ground that there was no such negligent conduct on the part of the state road commissioner, on which a moral obligation to pay the claims could arise as against the State, or for which the Legislature could appropriate public funds. *Adkins, Admr.* v. *Sims, Auditor,* 127 W. Va. 786, 34 S. E. 2d 585.

When the 1947 session of the Legislature convened, the appropriation made for payment of the claims mentioned above was still available. On March 8, 1947, by Senate Bill No. 221, after reciting the steps theretofore taken in respect to the claims, the Legislature made the following enactment:

"Section 1. The legislature affirms and approves the recommendation of the court of claims that there should be paid the awards listed below; and it likewise affirms the appropriations made by the legislature at its one thousand nine hundred forty-five session (contained in chapter eleven, acts of the legislature, regular session, one thousand nine hundred forty-five) to pay said

awards as claims against the state road commission. The legislature therefore makes the following awards:

"To Roy H. Adkins, Administrator, for the death of Roy Herbert Adkins, Jr., the sum of three thousand five hundred dollars;

"To J. P. Burgess, Administrator, for the death of Edward Sinclair Burgess, the sum of three thousand five hundred dollars;

"To Edward D. Burdette, Administrator, for the death of Edward D. Burdette, Jr., the sum of three thousand five hundred dollars;

"To C. J. Jones, Administrator, for the death of Esther Jones, the sum of three thousand five hundred dollars;

"To E. W. Lively, Administrator, for the death of Ruth Ann Lively, the sum of three thousand five hundred dollars;

"To Joe Surber, Administrator, for the death of Marguerette Frances Surber, the sum of three thousand five hundred dollars;

and authorizes the payment of each of said awards from funds in the state treasury pursuant to a valid appropriation bill separate and apart from this act.

"Sec. 2. The legislature hereby declares, as a finding of fact, that each of the foregoing awards, and the payment thereof, under the circumstances involved in each claim, constitutes a moral obligation of the State of West Virginia."

The relators herein, relying on the legislative enactment last aforesaid, and upon the interpretation of the effect of this Court's decision in *Adkins, Admr.* v. *Sims, Auditor, supra,* again presented their claims to the auditor, and requested that he issue warrants on the state treasurer for their payment. This he refused to do; whereupon the relators filed separate petitions in mandamus, in which they prayed that the state auditor be compelled to issue a state warrant on the treasurer of this State, for the payment to each of the relators the sums so

appropriated as aforesaid. Each of the said petitions contains allegations of fact, not denied, which correspond to those set out in this opinion. On each of these petitions we awarded a rule against the respondent, Edgar B. Sims, auditor, commanding him to appear and show cause, if any he could, why the prayer of each of the said petitions should not be granted. All of the claims, involving identical questions of law and fact, were, by stipulation of counsel, argued and heard together as one case, and are so decided.

The respondent filed his demurrer to each of the said petitions, in which the relators joined. The demurrers assert the following propositions of law, justifying the denial of the writs prayed for: (1) The finding by the Legislature of a moral obligation to compensate relators is based on facts which give rise to juristic conditions, and is subject to judicial power of investigation and final determination; (2) the legislative appropriation is unconstitutional, null and void, because made for a purely private purpose, and, in effect, grants the credit of the State in aid of the relators, in violation of Section 6 of Article X of the Constitution of this State; (3) there being no statute requiring the same, the absence of guard rails, road markers, and painted center lines, at the point of the accident here involved, did not constitute negligence on the part of the state road commissioner, on which a moral obligation arose as against the State, for which the Legislature may appropriate public funds; (4) the construction and maintenance of public highways is a governmental function, and no liability is imposed upon the State for the torts, acts or omissions of its officers, agents or employees, and such liability is denied under Code, 17-4-37; (5) there exists no moral duty on the part of the State to pay the legislative appropriations, because the State was not liable for said accident, and received nothing of value or benefit in consideration of the appropriations made, and persons travelling on the highways of the State assume the risks attendant thereto; (6) the State is not the insurer of the safety of the roads and highways of the State;

(7) the petitioners failed to show facts disclosing a moral obligation on the part of the State to compensate relators; and (8) the petitions fail to disclose that the absence of guard rails, center lines, and markers, was the proximate cause of the accident, and disclose no entrapments or defects of the travelled portions of the highway.

These cases have been submitted to us on the several petitions, and the demurrers of the respondent. By stipulation of counsel, we are asked to consider, as a part of the record, the reports or opinions of the State Court of Claims, touching the claims in controversy.

Before we take up the several questions raised by the petitions and the demurrers thereto, we think it necessary to pass upon the contention raised in the brief of the relators, namely, that the decision of this Court, in the case of *Adkins, Admr.* v. *Sims, Auditor, supra,* is the law of these cases; that the legislative declaration of a moral obligation on the part of the State to pay the claims here asserted was final and conclusive of relator's clear legal right to the writ prayed for, and binding on this Court. It is stated in the brief that "There is one feature in this case which, irrespective of the other issues or points of law involved, would make it necessary for the writ of mandamus prayed for in this case to be granted," and then goes on to argue the contention stated above, basing the same on the language used by Judge Kenna in the opinion in the *Adkins* case, which language has been quoted above.

We do not think there is any merit in this contention, even as to the *Adkins* case, and certainly not as to the other claims which were never heretofore considered by this Court. We do not question the holding of many cases, decided by this Court, that in a pending suit or action, a decision of the appellate court on a question of law once made, becomes the law of the case in future proceedings in a trial court in the same case, or even in a subsequent suit or action on the same cause of action. See cases cited in relators' brief: *Colerider, et al.* v. *Central National*

*Bank of Buckhannon, et al.,* 128 W. Va. 520, 37 S. E. 2d 466; *Meadow River Lumber Co.* v. *Smith, et al.,* 126 W. Va. 847, 30 S. E. 2d 392; *Tressler Coal Mining Co.* v. *Klefeld, et al.,* 125 W. Va. 301, 24 S. E. 2d 98; *Rash* v. *Norfolk & Western Railway Co.,* 122 W. Va. 688, 12 S. E. 2d 501; *William C. Atwater & Co., Inc.* v. *Fall River Pocahontas Colliery Co., et al.,* 119 W. Va. 549, 195 S. E. 99. The fact that only the majority of an appellate court joins in the decision establishing the law of a case does not lessen its legal effect. *Postlewaite* v. *Wise,* 17 W. Va. 1.

But the contention of the relators goes much farther than the language in the *Adkins* case on which they rely. Interpreting this language, relators in their brief say:

> "In the instant proceeding in mandamus, the majority of the Court on the first hearing on the matter of payment of the instant claim determined that the right of the claimant involved therein to recover from the State the legislative appropriation was to be determined solely by the test of whether the Legislature had found, as a conclusion of fact, that the appropriation was in payment of a moral obligation. In fact, the language used by this Court in the former hearing of this cause amounted to a directive to the Legislature that before this claim could be allowed it was necessary that the Legislature find that the payment of said claim was a moral obligation of the State of West Virginia, and that no other questions concerning the validity of the claim was or would be involved and the Legislature, acting in very much the same capacity as a trial court, made its enactment on the strength thereof, which it undoubtedly had the right to do."

We do not think the language used by the majority in the *Adkins* case, on the former hearing, should be given that construction and meaning. In our opinion, and we so hold, it did nothing more than establish the principle that, in no event, could appropriation be made by the Legislature for payment of a claim based on an asserted moral obligation of the State to pay the same out of public funds, even though there had been a finding of that obligation

by the Legislature. A fair and reasonable interpretation of the holding is that he who would base his claim on a moral obligation, must, as the first step, affirmatively establish before the Legislature, and obtain from it a finding, that a moral obligation, on the part of the State, existed. The syllabus in the *Adkins* case, in which the entire Court joined, reads: "In order to validate a legislative appropriation of public money for private use it must affirmatively appear that the Legislature in making the appropriation has found that it was necessary in order to discharge a moral obligation of the State." Neither in the syllabus, nor in the majority opinion, is there the slightest intimation that we intended to preclude ourselves from passing on the merits of the case, should the preliminary requirements be forthcoming. No member of the majority expressed any opinion whether, on the merits of the case, the claimant was, or was not, entitled to payment of his claim; and we do not believe that it was intended to bind the Court to give to the Legislature a free hand to determine finally the question of whether the case was one in which a moral obligation to pay the claim existed. In *Woodall* v. *Darst*, 71 W. Va. 350, 77 S. E. 264, it was held: "Whether an appropriation is for a public, or a private, purpose, is a judicial question; but if it does not clearly appear from the act of appropriation that it is for a purely private purpose, the Court cannot so decide. If any doubt exists as to whether it is for a public or a private purpose, the Court must uphold the legislative act." In our opinion, the Court did not in the *Adkins* case surrender, or intend to surrender, to the Legislature, the sole right of determining whether the appropriation to pay the *Adkins* claim would be for a public, or merely a private purpose, and if we should hold that the Legislature, under that case, has the sole right to determine the question of moral obligation, we will have done exactly that; for it is held, in the same case, that the payment out of public funds made to discharge a moral obligation of the State is for a public purpose. We therefore conclude that we are free to decide the cases on their merits.

On the merits of these cases we base our conclusion on the following propositions of law: (1) Under the specific provisions of Section 35, Article VI of the Constitution of this State, no suit or action, on a demand of the character here made, may be maintained against the State, therefore, no recovery can be had against the State on any cause of action; (2) the construction and maintenance of public highways being a governmental function, there could be no recovery against the State for the negligence or misconduct of its agents or employees, even if a suit or action could be maintained against the State. *Hayes* v. *Town of Cedar Grove*, 126 W. Va. 828, 30 S. E. 2d 726, and cases there cited; and (3) the Legislature is without power to appropriate public funds for other than a public purpose; but an appropriation by it in discharge of a moral obligation of the State is for a public purpose. *Woodall* v. *Darst, supra; Cashman* v. *Sims, Auditor,* 130 W. Va. 430, 43 S. E. 2d 805.

On the assumption that these propositions of law will not be controverted, we reach the two questions on which we must decide these cases: (1) Did the circumstances surrounding the death of relators' decedents create a moral obligation on the part of the State, to pay the compensation contended for in these proceedings; and (2) is a declaration of the Legislature that such moral obligation was created, conclusive on that question, and binding on the Court. We will discuss first the second question, for if it be answered in the affirmative, we need go no farther.

The question of whether an appropriation made by the Legislature is for a public or private purpose is a judicial one twice answered in the affirmative by the decisions of this Court. *Woodall* v. *Darst, supra; Cashman* v. *Sims, Auditor, supra.* In the *Cashman* case we said: "A finding by the Legislature of the existence of a moral obligation of the State, based upon facts which give rise to a juristic condition, is subject to investigation and consideration by the courts; and the determintaion of the ex-

istence of such obligation is a judicial, not a legislative, function." It is quite true that we have stated in the *Woodall* case: "A fact once determined by the Legislature, and made the basis of an act, is not thereafter open to judicial investigation"; and in *Lemon* v. *Rumsey*, 108 W. Va. 242, 150 S. E. 725, we said: "A legislative declaration of fact, if not arbitrary, is final"; but in *Berry* v. *Fox*, 114 W. Va. 513, 172 S. E. 896, we held: "A legislative declaration in respect of an existing condition as of fact but actually juristical, is not conclusive"; and the holding on that point in the *Cashman* case has been quoted. In the latter case, in the opinion prepared by Judge Haymond, the question being discussed at length, and the reasons for the rule there announced plainly stated, there would seem to be no reason for their repetition here. We conclude, therefore, that whether a legislative declaration of fact is to be accepted as generally binding on the courts, depends on whether the question declared upon is or is not judicial in character. According to the *Woodall* case: "Whether an appropriation is for a public or a private purpose is a judicial question." In the cases at bar the appropriations were clearly for a private purpose, unless it be held that they were made in discharge of a moral obligation of the State. How then can we pass on the judicial question of whether the appropriations were for a public or a private purpose unless we are permitted to pass upon the question of moral obligation? The question answers itself. In our opinion, the question is a judicial one, and the declaration of the Legislature, although entitled to respect, is in no wise conclusive, or in any way binding on this Court.

We come to the final question: Did the deaths of claimants' decedents, in the circumstances shown by the record, justify the Legislature in declaring that there arose a moral obligation on the part of the State to compensate the estates of the decedents for their deaths?

For the first time in the history of this State the question has now been presented to this Court in naked form. It was presented in *Adkins, Admr.* v. *Sims, Auditor, supra,*

but disposed of without reaching the merits. We must now squarely face the issue.

No one will deny the right of the Legislature to appropriate public funds in discharge of a moral obligation of the State. This power was first recognized in *Slack* v. *Jacob,* 8 W. Va. 612. That case involved an appropriation made in connection with the removal of the state capital from Charleston to Wheeling. The defendant generally relied on Section 38, Article VI of the Constitution, which provides: "* * * Nor shall any legislature authorize the payment of any claim or part thereof, hereafter created against the State, under any agreement or contract made, without express authority of law; and all such unauthorized agreements shall be null and void. * * *." This Court, quite properly, held that this provision of the Constitution "* * * does not apply to claims predicated upon simple justice and right and does not prevent the Legislature from voluntarily doing justice and right, when the claim is not predicated on a contract made without express authority of law." It will be observed that this case discusses the right of the Legislature to appropriate funds in certain cases arising out of contract, although, of course, it may be argued that the same principle should extend to cases arising out of the negligence of officials of the State, or their employees. The next case decided was that of *Woodall* v. *Darst, supra,* where in pursuance of a general legislative undertaking to provide for injuries sustained by members of the national guard on duty, an injured member of the West Virginia National Guard made claim for his injury, and an appropriation out of public funds was made in payment of damages therefor. This appropriation was held to be one made for a public purpose and was sustained by this Court. In *Glover* v. *Sims, Auditor,* 121 W. Va. 407, 3 S. E. 2d 612, an appropriation to pay indebtedness of the Athletic Department of the University of West Virginia was upheld. In the case of *Cashman* v. *Sims, Auditor, supra,* an appropriation of two thousand dollars to the relator in that case, growing out of his having allegedly contracted tuberculosis, while em-

ployed in a tuberculosis sanitarium operated by the State, was denied as not being for a public purpose. In the case of *State ex rel. Davis Trust Co.* v. *Sims, Auditor,* 130 W. Va. 623, 46 S. E. 2d 90, an appropriation of five thousand dollars to the estate of an elderly lady, violated and murdered by an escaped convict, was held to be for a public purpose, on account of the particular circumstances surrounding the case.

In *Cashman* v. *Sims, Auditor, supra,* a general principle is announced:

> "The sound and just general rule by which a moral obligation of the State in favor of a private person may be recognized, and for the payment of which a valid appropriation of public funds in the interest of the public may be made by the Legislature, requires the existence of at least one of these components in any particular instance: (1) An obligation or a duty, by prior statute created or imposed upon the State, to compensate a person for injury or damage resulting to him from its violation by the State or any of its agencies, or to compensate him for injury, damage, or loss sustained by him in or by his performance of any act required or authorized by such statute; or (2) an obligation or a duty, legal or equitable, not imposed by statute but created by contract or resulting from wrongful conduct, which would be judicially recognized as legal or equitable in cases between private persons."

The pending claims are based entirely on the theory that the State, though its road commissioner, his agents and employees, was negligent in that, at the point where the six young people lost their lives, there had been a failure to provide guard rails, and to place road markers, and failure to paint a center line on the paved portion of the highway. Do these admitted failures constitute negligence out of which it can be said that a moral obligation arises on the part of the State to compensate for the death, injury or damage, proximately resulting therefrom?

It is unnecessary to deal at length with the development of our highways. It began about thirty years ago, with

the establishment of our system of state highways connecting county seats. This system, known as the primary system, has been largely, although not entirely, completed. In 1933 the roads not included in the primary system, and theretofore controlled by the county courts of the various counties, were taken over by the State, and designated as secondary roads, some of which have been improved by relocation, grading, draining, and in many instances surfacing. The development of our highways is still proceeding, but to indicate how incomplete the system is, the Legislature, at its 1947 session, submitted to the people of the State a proposal to issue the bonds of the State, in the sum of fifty million dollars, for the improvement and construction of secondary roads. It should again be stated, however, that Route No. 61, where claimants' decedents were killed, is a primary road; but all highways, primary and secondary, are being constantly improved and maintained, to the extent that legislative appropriations, and other available funds, will permit. With all this, it is a matter of common knowledge that much remains to be done in the construction and improvement of the highways of this State.

During these years, the state road commissioner, though not required by any statute so to do, has constructed guard rails, at dangerous points on the highways, particularly primary highways, and has set up markers or danger signals and has painted center lines on paved roads. At many other places such precautionary measures have not been taken. The road program is developed at the discretion of the road commissioner, and his agents and employees, and is necessarily limited by the money available for that purpose. Improvements made at one point lessen the probability that another point will be so improved. There never has been sufficient money available to make the highways absolutely safe, even if money available for construction and repair could do so.

This being the situation, and so well known that everyone is supposed to be acquainted with it, we do not mean to be heartless or cynical when we say that every user of

the highways travels thereon at his own risk. The State does not, and cannot, assure him a safe journey. It has taken the money provided by the people, and built for them the best and safest highways their tax contributions will permit, and it can go no farther. Everyone knows that the task is incomplete. We may fairly assume that the claimants' decedents were fully acquainted with these facts, and surely they knew the condition of State Route No. 61, when they began their fateful journey. There is no contention that the road proper was in an unsafe condition. The death of the decedents occurred when their automobile left the highway. It may be assumed that the presence of a guard rail would have saved them, but that, in our opinion, does not affect the question in issue.

We do not think the failure of the state road commissioner to provide guard rails and road markers, and to paint a center line on the highway, constitutes negligence of any character, and particularly no such negligence as would create a moral obligation on the part of the State to pay damages for injury or death, assumed to have occurred through such failure, and as the proximate cause thereof. The very nature of the obligation of the State, in respect to the construction and maintenance of its highways, precludes the idea that its failure to exercise discretion in favor of a particular location over another, on whether it should provide guard rails, center lines or danger signals at that point, is an act of negligence. Certainly, it must be known, as a matter of common information, that places of danger on our highways exist at innumerable points, particularly on our secondary roads, and in many instances on primary roads. This being a mountainous country, many of these roads are narrow, with steep grades and sharp curves. Considering the financial limitations placed upon the road commissioner, it would seem impossible to take care of all defects at one time, even in one year, assuming that labor and supplies could be made available. In the very nature of things, the road commissioner must be permitted a discretion as to where the public money, entrusted to him for road pur-

poses, should be expended, and at what points guard rails, danger signals and center lines should be provided, and the honest exercise of that discretion cannot be negligence. To allow the claims here presented would be to hold that the state road commissioner, and his employees, were negligent in not providing safety measures at the point where this accident occurred, and without taking into consideration the same obligation to provide like safety measures at every other point of danger on the highways of this State. Certainly, where the road commissioner is vested with discretion in matters of this character, it cannot be negligence that he selects for safety measures one point over another.

We do not mean to say that situations may not arise where the failure of the road commissioner properly to maintain a highway, and guard against accidents, occasioned by the condition of the road, may not be treated as such positive neglect of duty as to create a moral obligation against the State, for which the Legislature may appropriate money to pay damages which proximately resulted therefrom. But this is not such a case. Here the simple proposition is: No fault was found with the road; but only that certain precautions had not been taken to guard against accidents at a particular point, that point being only one of many points, some possibly of even greater danger. If we should award these writs, the Legislature would hereafter be given full authority, and, if the precedent thus created be followed, would be required to compensate every person injured on the highways of the State, resulting from failure to maintain an absolutely safe condition on every mile of our highways, primary and secondary. There is no half way place.

The opinions expressed herein necessarily call for a refusal to award the writs prayed for.

*Writs refused.*

KENNA, JUDGE, concurring:

Upon the former hearing of this case in this Court we did not consider the effect of a finding by the Legislature

that the State was morally obligated to pay a part or all of the claim because at that time and upon that record there was no legislative finding on that question before the Court. *Adkins, Admr.* v. *Sims, Auditor,* 127 W. Va. 786, 34 S. E. 2d 585. Therefore, the principle of the law of the case plainly does not apply. The decision in the *Adkins* case in determining the question of whether the claim was a moral obligation of the State, turned upon the effect to be given, first, to a finding of the State Court of Claims and, second, to an actual appropriation in the amount of that finding which followed with no legislative declaration. We held that neither determined that question.

I am not in accord with the reasoning of the majority, particularly the fear expressed that a different decision, if followed, would result in compensating every one injured upon a State highway not maintained in "an absolutely safe condition." True, the Legislature would be given quite a broad discretion in determining when the State is morally obligated. That is where the discretion should rest. If exercised, it should be held conclusive unless shown to be arbitrary, capricious, or improperly influenced. Those views, however, I attempted to express in my dissent in the case of *State* v. *Sims,* 130 W. Va. 430, 43 S. E. 2d 805, called the *Cashman* case, and so I am not dissenting here.