STATE *ex rel.* MARILYN STOLLINGS

*v.*

DENZIL GAINER, *Auditor* OF THE STATE OF WEST VIRGINIA

(No. 12862)

Submitted September 23, 1969.    Decided October 28, 1969.

Dissenting Opinion filed November 20, 1969.

*W. Bernard Smith,* for relator.

*Chauncey H. Browning, Jr.,* Attorney General, *Dennis R. Vaughan, Jr.,* Assistant Attorney General, for respondent.

BERRY, JUDGE:

This original mandamus proceeding was instituted in this Court by Marilyn Stollings against Denzil L. Gainer, Auditor for the State of West Virginia, in order to obtain a writ of mandamus compelling the respondent to issue a warrant in the amount of $10,000 in compliance with a requisition from the State Road Commission to cover damages Mrs. Stollings suffered in an automobile accident which the 1969 Regular Session of the Legislature of West Virginia found to be a moral obligation and appropriated money for such claim in Enrolled House Bill 958. After the Auditor refused to honor the requisition issued by the State Road Commission, this proceeding was instituted in this Court by the petitioner and a rule was issued on September 8, 1969 returnable September 23, 1969 at which time the case was submitted for decision upon arguments and briefs of the parties.

The claim involved in this proceeding has been pending for some time and is complicated by the course of the procedure it followed. The petitioner was injured in an automobile accident on June 6, 1964 when a car she was driving slid off the road known as Route 10-W, a few miles from Logan in Logan County, West Virginia, between North Mitchell Heights and Pecks Mill Bridge. On June 16, 1966 the petitioner filed her claim before the Attorney General of West Virginia, who at that time was vested with authority by statute as an "instrumentality of the legislature" to hold hearings on claims against the state, and make recommendations thereon to the legislature with regard to the payment thereof. A hearing was held before the claims division of the office of the

Attorney General on November 3, 1966 although apparently no decision or recommendation was made after such hearing. At the 1967 regular session of the legislature of West Virginia an act was passed which transferred the duties of the Attorney General in this respect to a newly established "Court of Claims". The effective date of the act creating a new Court of Claims was July 1, 1967. By virtue of the implications of this act all claims before the Attorney General that had not been decided were transferred to the Court of Claims, among which was the claim involved in the case at bar.

On January 17, 1968 the Court of Claims, after reviewing the transcript of the hearing had before the Attorney General which had been turned over to it, rendered an opinion in which it found the claimant guilty of contributory negligence and disallowed the claim. No appropriation had up to the date of disallowance been made by the legislature to pay the claim involved here and nothing further was done in connection with the claim until the 1969 regular session of the legislature at which time the Enrolled House Bill 958 was enacted which was an omnibus claims bill and included the petitioner's claim.

It appears from the act, a copy of which was made an exhibit and attached to the petition, that the legislature prefaced the omnibus claim act with the statement that it considered the findings of fact and recommendations reported to it by the Court of Claims concerning various claims against the state and agencies thereof, and with respect to each of the claims the legislature adopted such findings of fact as its own and declared it to be a moral obligation to pay each such claim in the amount specified and directed the auditor to issue warrants for the payment thereof. Regardless of whether this was a correct statement as to the other claims listed in the act, it was clearly an incorrect statement as to the claim involved herein, because the Court of Claims had done just the opposite to what the legislature said it had done. However, the act concluded after the claims were listed with the posi-

tive statement that the legislature found them to be moral obligations, and that the appropriation made in satisfaction thereof should be full compensation for each claimant, provided for the Court of Claims to receive a release from the claimants releasing all claims for the moral obligations arising from the matter considered by the legislature in the finding of the moral obligation, and the making of the appropriation for the said claimant. It also directed the Court of Claims to deliver all releases obtained from the claimants to the departments against which the claims were allowed.

On June 28, 1969 a release was prepared as required by the Bill and submitted to the Court of Claims which transmitted the release to the State Road Commission with an accompanying letter pointing out that the Court of Claims had denied the claim which the legislature had included as approved when it passed the act with the statement indicating that the claim had been allowed. When the Auditor received the requisition from the State Road Commission to pay the claim he declined to honor the requisition because the Court of Claims had reached one conclusion and the legislature another and he stated that the matter should be answered by "the courts".

The transcript of the evidence taken before the Attorney General which was attached to the petition as an exhibit shows that the claimant was seriously injured in the accident. She had numerous large scars on her legs and left arm, and a chipped vertebrae which her doctor stated would be a permanent injury. She suffered considerable pain, was confined to the hospital for over two weeks and walked with the use of crutches for some time after her release from the hospital. She was unable to do her housework and it was necessary for her to hire help to do this work, such extra hired help still being necessary at the time of the hearing. She was pregnant at the time of the accident and suffered a premature birth of her child which, according to the father's testimony, resulted in the health of the child being impaired.

The evidence as to the condition of the road in question where the accident occurred shows that it was one mile of experimental type of surface which apparently consisted of tar with sand on top of it followed by a layer of tar, sand and gravel mixed. This material was placed on the highway in April, 1962 and it appears that whenever it became wet or damp it was extremely slick resulting in an unsafe condition of the road. Numerous witnesses, including employees of the road commission, stated that there had been frequent wrecks on this one mile section of the road and constant complaints of the people living along this stretch of the road had requested that guard rails be placed in front of their property in order to keep cars from sliding off the road and hitting their homes. At least one witness stated that there had been several hundred wrecks on this section of the road or highway between the period it was placed there in 1962 and the time he testified in 1966. The condition of the road in question was known by the state road commission as early as 1962 and the local and regional officers of the road commission spent considerable time and money in an attempt to give the surface an abrasive effect such as placing sand, "red dog" and small limestone particles, none of which were successful. The condition of the road was reported to high officials of the road commission but apparently the reports were misplaced or ignored, and no action was taken to correct the unsafe surface of the road in question until after the accident involved herein occurred. One wreck did $30,000 damage when a car ran off the road, hit a gas meter and considerable property was burned.

The evidence is in conflict as to whether any signs were posted warning of the dangerous condition of the road. When the condition of the road was reported to the district engineer he directed the road supervisor to post warning signs with regard to the road being slippery, but the signs were not placed by the county supervisor because he stated it was not his job and he did not know when the signs were put up. Apparently, they were there

at the time the hearing was held before the Attorney General. However, it appears that it was a matter of common knowledge that this section of the road where the accident occurred was extremely slick in wet weather.

There is a conflict in the evidence with regard to the speed the petitioner's car was being driven at the time of the accident. A witness who was driving his automobile approaching the claimant's vehicle at the time of the accident testified that she was going between 40 and 50 miles an hour. However, the claimant testified that she was positively not going over 35 miles an hour at that time, and her sister-in-law, who was a passenger in the car at the time of the accident, stated the car was being driven between 30 and 35 miles an hour. The witness who was approaching the petitioner's car at the time of the accident said he would consider 45 miles an hour a safe speed on that road, although another witness who did not see the accident said he would consider a speed of between 40 and 50 miles an hour to be an unsafe rate of speed for the road.

The petitioner knew that this experimental part of the road was slick when it was wet, and she stated that when it began raining about two miles from where the accident occurred she took proper precaution by slowing down when she entered this portion of the road. Regardless of this, she stated she slid, turned completely around and went over the bank resulting in the car turning over and pinning her in the wreckage.

The Court of Claims apparently disallowed the claim on the ground that regardless of any negligence on the part of the State Road Commission, which the Court thought was not sufficiently shown, the claimant or petitioner was guilty of contributory negligence by virtue of the speed she was driving at the time of the accident which was the proximate cause of the accident.

Attached to the petition as an exhibit were two affidavits, one by State Trooper C. T. Webb and another by Harold Hale, road supervisor at the time of the accident.

Trooper Webb, who investigated the accident but did not testify before the hearing of the Attorney General, stated in his affidavit that there were no warning signs posted regarding the dangerous conditions of the road, that that road was slick, defective and unsafe for travel and the driver of an automobile could not ascertain or anticipate from the conditions of the other portion of the same highway how slick the part was where the accident occurred, and that there was only a little moisture on the road at the time and that the rest of the road was not slick. Trooper Webb further stated that petitioner was not speeding at the time of the accident and no charges were placed against her. Harold Hale, who testified at the hearing before the Attorney General, stated in his affidavit that the road at the scene of the accident was of defective construction; that it was unusually slippery even in the mildest rain and was not of the same condition as the other portions of the road traveled by the public even when wet. He stated that it was like a trap since the rest of the road was not slick under the same conditions and suddenly drivers would come upon this portion of the road which was slick; that the road was defective and this condition was the cause of the accident in question and the road should not have been accepted by the State Road Commission as properly constructed in the first instance; and also that signs with regard to the dangerous conditions were not posted until after the wreck. Both of these affidavits were taken in June, 1969.

An answer was filed by the respondent which denied that there was any moral obligation on the part of the state to pay this claim and which asserted that it was his duty to deny payment where such payment was for a private purpose. He also contends the two affidavits attached to the petition should be stricken because they were not before the Court of Claims or the legislature for consideration.

A demurrer was filed to the answer that it was not sufficient in law, because it did not rebut the presumption

that the act was for a public purpose and did not show the lack of a moral obligation on the part of the state.

The Court of Claims is advisory and recommendatory in character to both the legislature and state agencies where, as here, an appropriation has not been made in advance of the Court's action. Its function in that manner is not judicial. It is created by the legislature with one of its purposes that of conducting investigations in aid of legislative actions for obtaining information necessary to enable the legislature to discharge its functions and to exercise its power of legislation. The legislature may accept or reject its findings, or approve or disapprove its recommendations. See *State ex rel. Adkins* v. *Sims*, 127 W. Va. 786, 34 S. E.2d 585, and *State ex rel. Cashman* v. *Sims*, 130 W. Va. 430, 43 S. E.2d 805, which were decided under the 1941 law creating a prior Court of Claims but are basically applicable to the present Court of Claims in explaining its jurisdiction.

The statement in the preface in Enrolled House Bill 958 is confusing because it states that it accepts the findings of fact of the Court of Claims and "adopts" them as its own in connection with this claim and specifically declares this claim to be a moral obligation, but actually the action of the legislature appears to be in conflict with the findings of the Court of Claims which had disallowed the claim, meaning that the Court did not find it to be a moral obligation. It was held in the syllabus of the case of *State ex rel. Adkins* v. *Sims*, 127 W. Va. 786, 34 S. E.2d 585, that: "In order to validate a legislative appropriation of public money for private use it must affirmatively appear that the Legislature in making the appropriation has found that it was necessary in order to discharge a moral obligation of the State." It affirmatively appears in the end of this act by the legislature that the appropriation was for a moral obligation for the state. It has been held that a legislative declaration of fact, if not arbitrary, will be considered as final. *Lemon* v. *Rumsey*, 108 W. Va. 242, 150 S. E. 725; and that "A legislative declaration of fact should be accepted by the courts unless there is

strong reason for rejecting it." *Glover* v. *Sims,* 121 W. Va. 407, 3 S. E.2d 612. However, when the declaration of fact by the legislature is based on facts which give rise to a juristic condition the declaration is not conclusive. The matter involved in the instant case being in its nature juristic, the power of the legislature in connection therewith is subject to judicial inquiry and consideration. *State ex rel. Cashman* v. *Sims, supra.*

This matter is clearly stated in the second syllabus point in the case of *State ex rel. Adkins* v. *Sims,* 130 W. Va. 645, 46 S. E.2d 81, in the following language: "Whether an appropriation is for a public, or a private purpose, depends upon whether it is based upon a moral obligation of the State; whether such moral obligation exists is a judicial question; and a legislative declaration, declaring that such moral obligation exists, while entitled to respect, is not binding on this Court."

This is not an appeal or review of the findings of the Court of Claims. This is an extraordinary proceeding governed by the Rules of this Court and the same procedure does not apply to cases on appeal. The evidence before the Court of Claims is merely an exhibit attached to the petition, as well as are the affidavits which are objected to by the respondent by the request to strike these affidavits because they are not before the Court of Claims and the legislature. There is no merit to this contention because under the Rules of this Court, Rule II, Section 8, Rules of Practice in the Supreme Court of Appeals, they may be considered and if objected to by the opposing party evidence may be taken to disprove contentions contained in the affidavit. This procedure was made abundantly clear in the case of *State ex rel. Wilson* v. *County Court,* 145 W. Va. 435, 114 S. E.2d 904, wherein it is stated in point 1 of the syllabus: "By Section 8, Rule II of this Court, exhibits may be filed with and made a part of the pleadings in any original proceeding in habeas corpus, mandamus, or prohibition instituted in this Court."

The evidence in this proceeding before this Court clearly shows that the road in question at the scene of the accident was in an unsafe condition, and that the State Road Commission was negligent in failing to properly maintain the highway and guard against accidents occasioned by the conditions of the road and that the petitioner was not guilty of contributory negligence which would bar her from recovery if an action with regard to this nature was brought between private individuals.

It has been recently held by this Court that where such facts exist it constitutes a moral obligation on the part of the state and would warrant the payment of the claim involved in the case presented here. *State ex rel. Vincent* v. *Gainer,* 151 W. Va. 1002, 158 S. E.2d 145.

The case of *State ex rel. Adkins* v. *Sims,* 130 W. Va. 645, 46 S. E.2d 81, held that there was no moral obligation on the part of the state where a car driven on the highway ran off the road and turned over injuring the occupants thereof because the contention was not valid that it was negligence on the part of the state in not having guard rails, signs posted and the road painted. In that case this Court stated that there was no contention that the road proper was in an unsafe condition and that: "We do not mean to say that situations may not arise where the failure of the road commissioner properly to maintain a highway, and guard against accidents, occasioned by the condition of the road, may not be treated as such positive neglect of duty as to create a moral obligation against the State, * * *".

The case of *State ex rel. Vincent* v. *Gainer, supra,* clearly distinguishes the second *Adkins* case, *State ex rel. Adkins* v. *Sims,* 130 W. Va. 645, 46 S. E.2d 81, from cases similar to the *Vincent* case and the case at bar, and is authority for the finding of a moral obligation and the payment of the claim involved herein.

For the reasons stated herein, the writ is granted.

*Writ granted.*

494

CALHOUN, JUDGE, dissenting:

Respectfully, I dissent from the decision embodied in the majority opinion in this case.

The case was submitted to the Court of Claims upon testimony taken on November 3, 1966, before an assistant to the state attorney general pursuant to the then-existing provisions of Article 2 of Chapter 14, Code, 1931, as amended. Before a ruling was made by the office of the attorney general in relation to the claim, the legislature, in 1967, repealed and reenacted the Code provision referred to above so as to create the Court of Claims and to clothe it with broad powers, duties and responsibilities in relation to claims against the state. The transcript of the testimony taken and other proceedings had at the hearing before the assistant to the attorney general discloses that both the claimant and the state road commission were represented by counsel, though counsel for the claimant at the hearing is not the attorney who has represented the claimant in the mandamus proceeding instituted in this Court.

In an opinion prepared by Judge Ducker, the Court of Claims reviewed the testimony in detail. In the testimony, which was filed as an exhibit with the mandamus petition in this Court, it is undisputed that the claimant was thoroughly familiar with the fact that the one-mile portion of the highway in question in this case was slippery and hazardous, particularly when the road was wet. This condition had existed for almost two years. It is undisputed also that rain had fallen on the day in question and that consequently the highway was wet when the accident occurred. The following statement in the majority opinion is misleading as is disclosed by the testimony and the findings of the Court of Claims: "* * * and no action was taken to correct the unsafe surface of the road in question until after the accident involved herein occurred." This means merely that the experimental type of surface was not discontinued until after the accident occurred. A portion of the opinion of the Court of Claims is as follows:

The weather was a drizzling rain and the road was slick, and claimant, who drove it frequently, knew it was slick when it was wet.

The testimony of claimant and one of her witnesses was that claimant was driving at a speed of 35 miles an hour and the speed limit was 55 miles an hour. As has been shown, Daniel Carper, the witness who saw the accident, said claimant was driving 40 to 50 miles an hour. Another witness testified that 40 to 50 miles an hour on that road was unsafe whether the driver knew the road or not. In determining whether a driver of an automobile has driven safely, the lawful speed limit may or may not be a factor in such determination. Weather is just as important and cannot be dismissed without serious consideration.

The evidence, we think, does not sufficiently show lack of proper maintenance for that type of road and the fact that other cars have wrecked may be corroborative in a limited way of specific fact showing negligence or lack of maintenance. There are too many other probable causes for wrecks. We cannot avoid believing that the speed at which the claimant was driving on a wet, slick road which she well knew, which speed was testified to by a wholly disinterested witness to be 40 to 50 miles an hour and unsafe, was the proximate cause of this accident, unfortunate as it was for all concerned.

It is the conclusion of this Court that the claimant has not proven sufficient facts to maintain her claim, and it is the opinion of the Court that her claim should be, and it is hereby, disallowed.

It is obvious, therefore, that the decision of the Court of Claims was predicated upon its findings of fact based upon the testimony upon which the case had been submitted for decision by counsel who represented the parties at the hearing held before the assistant to the attorney general.

On March 8, 1969, the legislature passed Enrolled House Bill No. 958, effective from passage, by which it undertook to declare a list of approximately seventy

claims to be moral obligations of the state and to direct the state auditor to issue warrants for the payment thereof. Included was the claim of Marilyn Stollings for the sum of $10,000. Other claims listed ranged in amounts from a low of $25 to a high of $144,349.53. The preliminary portion of the bill as enacted contains the following language:

> The Legislature has considered the findings of fact and recommendations reported to it by the court of claims concerning various claims against the state and agencies thereof, *and in respect to each of the following claims the Legislature adopts those findings of fact as its own,* and hereby *declares* it to be the moral obligation of the state to pay each such claim in the amount specified below, and directs the auditor to issue warrants for the payment thereof out of any fund appropriated and available for the purpose. (Italics supplied.)

The inconsistency of the statute appears on the face thereof as is clearly disclosed from the language quoted immediately above. The legislature made no independent legislative findings of fact in relation to the claim here in question. The second point of the syllabus of the present case, quoting from the first of the two *Adkins* cases, states that "it must affirmatively appear" that the legislature, in a case such as this, "has found that it was necessary in order to discharge a moral obligation of the State." By the clearly expressed and unambiguous language of the statute, the findings of fact so deliberately made and so clearly expressed by the three distinguished lawyers who are the judges of the Court of Claims were adopted by the legislature "as its own." The apparently casual, perfunctory legislative *declaration* that the claim here in question is a moral obligation of the state is wholly inconsistent with and legally unwarranted by the previous legislative *findings of fact*. This glaring inconsistency of the act as it relates to the Stollings claim evidences a casual and perfunctory consideration of the claim, or a lack of thoughtful and deliberate consider-

ation of the claim, as contradistinguished from the careful, painstaking, judicial consideration accorded to it by the Court of Claims.

This Court has consistently displayed a willingness to give proper weight to legislative findings of fact in areas in which legislative findings of fact may be made. *State ex rel. Appalachian Power Company* v. *Gainer*, 149 W. Va. 740, 750-51, 143 S. E.2d 351, 359. This Court, however, is under no obligation to adopt, and has no right to adopt, a mere legislative declaration that black is white or any other mere legislative fiat or edict which is contrary to an established state of facts or otherwise unwarranted. I have read the testimony of witnesses taken at the hearing before the assistant to the attorney general and, upon the basis of that testimony, I am of the opinion that the findings of fact made by the Court of Claims are fully warranted by the evidence. The testimony discloses that employees of the state road commission had made repeated efforts to correct or to alleviate the slick condition of this portion of the highway prior to the time of the occurrence of the accident involved in this case.

I believe the Court clearly erred in considering as evidence or as proof in this mandamus proceeding two affidavits which were filed as exhibits with the mandamus petition. One was an affidavit made by a state trooper on June 23, 1969. The other affidavit was made June 27, 1969, by a man who was county maintenance supervisor for Logan County when the one-mile section of experimental highway was constructed in 1962 and also when the wreck occurred in 1964. This latter affiant, Harold Hale, had testified in behalf of the claimant at the hearing held in 1966 before the assistant to the attorney general. The affidavits, therefore, were made approximately two and one-half years after the hearing, approximately eighteen months after the opinion of the Court of Claims was announced and almost three months after the effective date of the Enrolled House Bill No. 958. This, in effect, means that this Court has heard or tried this case de novo.

In his answer, the respondent asserts that both affidavits "should be stricken as neither of the statements was before the Court of Claims or the Legislature for consideration." The majority opinion, in support of its action in considering the affidavits as evidence or proof in this Court in support of the Stollings claim, refers to Section 8 of Rule II of the rules of this Court which is as follows: "In any original proceeding in habeas corpus, mandamus, or prohibition instituted in this court exhibits may be filed with and *made a part of the pleadings* in such proceeding." (Italics supplied.) The reason for this rule of pleading is explained fully in *State ex rel. Wilson v. The County Court of Barbour County,* 145 W. Va. 435, 441-42, 114 S. E.2d 904, 909. The purpose of the rule of this Court was to change a rule of pleading which, except as changed by this rule and by the Rules of Civil Procedure, was as stated in the second point of the syllabus of *Esso Standard Oil Company* v. *Kelly,* 145 W. Va. 43, 112 S. E.2d 461, as follows: "An exhibit, filed with a pleading in an action at law, unless authorized by statute or by rule of court, *is not part of the pleading* and can not be considered by the court." (Italics supplied.) The Court, nevertheless, proceeded in the present case to consider the contents of these affidavits, not as mere supplements to and parts of the petition as a pleading, but as evidence or proof.

It is true that this mandamus proceeding has been instituted in this Court pursuant to its original jurisdiction in cases of that character. In that sense it is an "original" proceeding. It is true, nevertheless, that the Court, in this particular case, sits as a reviewing tribunal, to determine the correctness or incorrectness of the action of the Court of Claims; or, as the majority opinion indicates, merely to review and to determine the correctness or incorrectness of the action of the legislature, wholly apart from the action of the Court of Claims. In any event, the Court in this case acts in a reviewing capacity and, in that sense, in an appellate capacity. It seems to

be too obvious to be questionable that the Court cannot consider and decide this case de novo.

While I believe the Court has committed serious errors in the particulars I have previously undertaken to state, I am of the opinion that the Court has erred in an area far more basic and serious in character. I am convinced that the action of the legislature in creating the present Court of Claims has wrought a drastic change in the law relating to moral obligation claims against the state and that such legislative action calls for a complete reexamination by this Court of all its prior decisions in this entire area.

By Chapter 20, Acts of the Legislature, Regular Session, 1941, there was created the original State Court of Claims. According to Section 2, it was to be "a special instrumentality of the Legislature for the purpose of considering claims against the state, * * * and recommending the disposition thereof to the Legislature. The court shall not be invested with or exercise the judicial power of the state in the sense of article eight of the constitution of the state. A determination made by the court shall not be subjected to appeal to or review by a court of law or equity * * *." It was accordingly stated in the second point of the syllabus of *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E.2d 805: "The State Court of Claims is a special instrumentality of the Legislature, * * *." The three judges of that court were appointed by the governor with the advice and consent of the senate. By Section 5, the secretary of state was made ex officio clerk of the court to serve without additional compensation. By Section 7, the regular meeting place of the court was to be in the offices of the secretary of state. Section 23 provided: "The clerk shall certify to the director of the budget * * * a list of all awards *recommended* by the court to the Legislature for appropriation." (Italics supplied.) Section 25 provided for various classifications of claims including the following: "1. Approved claims and awards not satisfied but referred to the Legislature for final consideration and

appropriation." I find in the former statute no required qualifications for holding positions as judges of the court except the following language in Section 10. "A judge shall not be a state officer or a state employee except in his capacity as a member of the court. A member shall receive no other compensation from the state." That provision, I believe, enumerates disqualifications rather than required qualifications.

While the Court held in *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E.2d 805, that the State Court of Claims was "a special instrumentality of the Legislature," it was also held in that case (130 W. Va. at 435-36, 43 S. E. 2d at 811) that the legislature had authority to delegate its fact-finding duties to the State Court of Claims and authority to adopt the court's findings as its own.

The 1941 statute which created the State Court of Claims was amended and reenacted by Chapter 18, Acts of the Legislature, Regular Session 1953, in such a manner as, generally speaking, to clothe the attorney general with the powers, duties and responsibilities formerly exercised and performed by the State Court of Claims. Section 3 provided: "The attorney general is hereby authorized to *act as a special instrumentality of the Legislature* for the purpose of considering claims against the state, * * *." (Italics supplied.) By Section 9, the attorney general was required to certify to the director of the budget "a list of all awards recommended by the attorney general to the Legislature for appropriation."

This Court has held in various cases that a legislative finding that a moral obligation exists is juristic or judicial in character. "The courts must decide whether a condition of that character, which arises from particular facts, creates a moral obligation against the State. The decision of that question involves the judicial process, and is a judicial, not a legislative, function." *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 438, 43 S. E.2d 805, 812. To the same effect, see the third point of the syllabus of the present case. Thus there was an obvious need for

the legislature to make provision for a judicial determination in advance of, rather than after, a legislative determination that a moral obligation on the part of the state does or does not exist.

By Chapter 27, Acts of the Legislature, Regular Session, 1967, Article 2 of Chapter 14, Code, 1931, as amended, dealing with consideration of claims against the state by the attorney general, was amended and reenacted so as to create the present Court of Claims. I am convinced that the obvious purpose of the 1967 act, creating the Court of Claims, was to provide, in advance of legislative action, a means of having a judicial determination of the question whether, in a given situation, a moral obligation does or does not exist.

By reason of the separation of powers provisions of Article V of the Constitution of West Virginia, as construed by this Court in many of its decisions, the legislature lacks power to determine the juristic or judicial question whether a valid moral obligation does or does not exist in any given situation. Prior to July 1, 1967, the effective date of the act which created the Court of Claims, there was no means provided whereby the legislature could know whether its declaration of a moral obligation against the state was valid or invalid until there could be arranged a subsequent, often delayed, adjudication of that question by this Court.

It seems quite obvious to me that, by the 1967 enactment, the legislature wisely undertook to provide and did provide for the requisite judicial determination in advance of legislative action, which legislative action previously had proved, in some instances, to have been abortive and futile. It is obvious also that there was need for a tribunal which could make findings of fact in relation to the numerous, often complicated, claims of this character. The very nature of the legislature is such that it lacks the time and facilities for holding proper and adequate factual hearings in relation to the constantly multiplying number of claims in this category.

particularly since this Court has held that legislative findings in this area are juristic or judicial in character as distinguished from legislative findings in other areas. *State ex rel. Cashman* v. *Sims*, 130 W. Va. 430, 438, 43 S. E. 2d 805, 812. It is in this background, I believe, that we should undertake a judicial determination of the purpose, intent and effect of the 1967 statute by which the Court of Claims was created.

The 1967 legislative enactment repealed and reenacted Article 2 of Chapter 14, Code, 1931, as amended, as a consequence of which the Court of Claims was created. It is my purpose hereafter in this dissenting opinion to point out the judicial character of the Court of Claims as contradistinguished from the 1941 enactment which created the State Court of Claims and the 1953 enactment which clothed the attorney general with certain duties and responsibilities in relation to claims against the state.

The 1941 enactment, which created the State Court of Claims, provided that the court was to "be a special instrumentality of the Legislature for the purpose of considering claims against the state, * * * and recommending the disposition thereof to the Legislature. The court shall not be invested with or exercise the judicial power of the state in the sense of article eight of the constitution of the state." No identical or similar provisions appear in the 1967 enactment. The 1953 enactment contained the following provisions: "The attorney general is hereby authorized to act as a special instrumentality of the Legislature for the purpose of considering claims against the state, * * * and recommending the disposition thereof to the Legislature. Nothing in this article is to be construed as an attempt to invest the attorney general with judicial power in the sense of article eight of the constitution of this state." No identical or similar provisions are included in the 1967 enactment by which the Court of Claims was created.

We must assume that the legislature acted deliberately and with a purpose in omitting from the 1967 enactment

the words "as a special instrumentality of the Legislature"; in omitting the words "recommending the disposition thereof to the Legislature"; and in omitting the inhibition against the exercise of "judicial power in the sense of article eight of the constitution of this state." The 1967 enactment which removed from the statute these provisions, which had been a part of Article 2 of Chapter 14, since 1941, indicates to me a clear legislative purpose to provide that the Court of Claims is not intended to be a mere "instrumentality of the Legislature" for the purpose of "recommending the disposition" of moral obligation claims to the legislature but rather that the Court of Claims is clothed with judicial power to determine whether claims are or are not moral obligations of the state, for the very good reason that this Court has repeatedly held that such judicial function cannot be exercised by the legislature itself.

It is reasonable to assume that the legislature, by the 1967 enactment, recognized the common sense, reason and logic of having the required judicial determinations before, rather than after, legislative action in relation to moral obligation claims against the state.

The 1967 enactment in many other respects evidences a clear legislative purpose to create a tribunal clothed with power and a duty to perform judicial functions. Section 10, dealing with qualifications of judges of the Court of Claims, contains the following provision: "Each judge appointed to the court of claims shall be an attorney at law, licensed to practice in this State, and shall have been so licensed to practice law for a period of not less than ten years prior to his appointment as judge." Highly qualified and experienced lawyers have been appointed as judges of the Court of Claims, including one who previously served with distinction as one of the judges of this Court. Why were these required qualifications placed in the statute for the first time in 1967 unless the legislature was undertaking to create a judicial tribunal? One or more persons not qualified as experienced lawyers

could make mere findings of fact and consequent recommendations to the legislature.

Section 12 contains the following language: "Each claim shall be considered by the court and if, after consideration, the court *finds that a claim is just and proper,* it shall so determine and shall file with the clerk a brief statement of its reasons. *A claim so filed shall be an approved claim.* The court *shall also determine the amount* that should be paid to the claimant, and shall itemize this amount as *an award,* with the reasons therefor, in its statement filed with the clerk." (Italics supplied.) This language, I believe, clearly contemplates a judicial determination that a claim is "just and proper" and also contemplates written opinions quite analogous, in this limited area, to the functions of this Court.

Section 17 contains the following language: "If the court determines that the claim should be entered as an approved claim, *and an award made, it shall so order* and shall file its statement with the clerk." (Italics supplied.) Statutes of limitation provided by Article 2 of Chapter 55, Code, 1931, as amended, are made applicable to claims presented to the Court of Claims. The secretary of state is not ex officio clerk of the court and the meeting place of the court is not in the offices of the secretary of state as was the situation in relation to the State Court of Claims, under the 1941 enactment. Under the 1967 statute, the Court of Claims "shall have the authority to appoint a clerk." Incidentally, it is my understanding that persons who have served in that capacity have been lawyers. Section 7 provides: "The regular meeting place of the court shall be at the State Capitol, and the joint committee on government and finance shall provide adequate quarters therefor." Section 25 provides that the clerk shall be the official reporter of the court, with a duty to collect and edit the approved claims, awards and statements and to prepare them for publication and submission to the legislature in the form of an annual report. Section 25 contains the following additional provision: "The annual

reports of the court shall be published by the clerk as a public document."

Section 28 provides: "It is the policy of the legislature to make no appropriation to pay any claims against the State, cognizable by the court, unless the claim has first been passed upon by the court." Section 27 is as follows: "Any final determination against the claimant on any claim presented as provided in this article shall forever bar any further claim in the court arising out of the rejected claim." These two sections, when read together, strongly indicate that the legislature has no authority to make an appropriation to pay a claim unless the claim has previously been adjudicated by the Court of Claims to be a legally valid moral obligation of the state.

I believe this Court, at some appropriate time, must squarely meet and decide what are the status, functions, powers and jurisdiction of the Court of Claims. Such an adjudication by this Court is needed by the legislature, by the Court of Claims, by claimants and by counsel who may assert or oppose moral obligation claims. The conclusion is inescapable that the 1967 enactment creates "a new ball game" in the law pertaining to moral obligations against the state. It is obvious that the legislature, by this enactment, intended to accomplish a change in the law in this area. I am unwilling to assume that the legislature meant to waste the taxpayers' money and the time, energies and talent of three experienced lawyers, appointed to perform judicial functions, without accomplishing by the enactment a commensurate change in the prior law embodied in statutes and decisions of this Court. I am unwilling to concede that the legislature intended that the adjudications of the Court of Claims in relation to moral obligation claims against the state should be regarded by the legislature or by this Court as a futile and meaningless waste of public funds and legal talent.

I believe it would be unbecoming and presumptious on my part if I were to undertake to state what the Court should and ultimately must decide in relation to the ques-

tions I am trying to pose. I assume that if the Court of Claims makes an award and the legislature makes an appropriation for the payment thereof, the legal questions pertaining to the existence or nonexistence of a moral obligation against the state may be determined by this Court just as such questions have been presented to the Court for decision in the past. Perhaps only the legislature can waive or avoid the effect of the state's governmental immunity and that it can do so by making an appropriation for payment of a moral obligation. Perhaps, under the constitutional provision dealing with separation of powers, neither the executive branch nor the judicial branch of state government may in any way encroach upon, defeat or diminish that legislative prerogative. The legislature may in its discretion refuse to make an appropriation to pay an award made by the Court of Claims and possibly that would be the end of the road for the claimant. In any event, I believe that, in the future as in the past, both the legislative powers and the judicial powers remain inviolate. The 1967 enactment, I believe, does not diminish or otherwise affect the constitutional powers of the legislature.

For reasons stated in this dissenting opinion, I would refuse to award the writ of mandamus.