STEPTOE, JUDGE:
*318 Claimant, Jeremy Tait Hunt, brought this action for permanent physical injuries he sustained when the vehicle in which he was a passenger went off a bridge on Sate Route 49 in Thacker, Mingo County. The driver of the vehicle and claimant were traveling northbound between Edgarton and Matewan. At this location, State Route 49 is maintained by respondent, the Division of Highways, The Court is of the opinion to disallow this claim for the reasons more fully stated below.
FACTS OF THE CLAIM
The incident giving rise to this claim occurred on June 26, 1993, at approximately 12:30 p.m. On the day in question, the sixteen year-old claimant was a passenger in a 1991 Ford Escort driven by Celia Michelle Murphy.[1] The vehicle was owned by Ms. Murphy’s father, Larry Murphy. Ms. Murphy and the claimant were traveling northbound on State Route 49 at a speed of about thirty to thirty-five miles per hour, in the opinion of Ms. Murphy. The unposted speed limit for this road was fifty-five miles per hour. Ms. Murphy regularly traveled this portion of road of State Route 49 on her way to and from high school. She was very familiar with the road. At the time of the incident herein, claimant and Ms. Murphy were proceeding from her residence in Edgarton towards Matewan with the final destination being the Huntington Mall.
At this location, State Route 49 is a two-lane road with double yellow lines indicating the center of the road and white lines on the edges of the pavement. Ms. Murphy testified that the road was in a state of disrepair. She asserted that there were ruts in the pavement. The weather on the day in question was rainy and the roads were wet. As Ms. Murphy drove over a crest at the top of a hill on State Route 49, she p roceeded do wnhill t owards t he Gr apevine Br idge a 11 he b ottom. When t he vehicle began moving downhill, Ms. Murphy testified that the vehicle began to hydroplane and she lost control of the vehicle. She panicked, shut her eyes, and took her hands off the steering wheel. Ms. Murphy further testified that after she released the steering wheel, she remembered the claimant having grabbed the steering wheel. At that point, the vehicle left the surface of the road, went to the right of the Grapevine Bridge, proceeded in the air across Grapevine Creek and Lick Fork Road, struck the northeastern side of the embankment at the north end of the bridge, flipped in the air, and landed on its top on Lick Fork Road directly beneath the Grapevine Bridge. Ms. Murphy sustained personal injuries which were not permanent in nature. Ms. Murphy recalled that she did not have the automatic shoulder harness across her body, but she did have on the lap belt. She did not believe that claimant had on his lap belt.
*319 The claimant herein was very familiar with State Route 49 at the scene of this accident. He went back and forth to high school using this stretch of roadway. On the day of this incident, he explained that he was tired as he had worked that night before and his mother took him to Michelle Murphy’s home so the two of them could go to the Huntington Mall. He testified that it was raining at the time. He was in a reclined position in the passenger seat in the vehicle with both of his seat belts, the lap belt and the shoulder harness, in place. He recalled that he heard Ms. Murphy scream, he then raised up in his seat, leaned forward to try to place his hands on the dashboard, and realized that they were already going off the bridge. He stated that he “didn’t have time to even say nothing (sic). I was just overwhelmed by what was happening. It just was unreal.” In his opinion, the vehicle was going 40-45 miles per hour immediately prior to the accident. Claimant testified that there were two sags in the pavement in their lane of travel, one located about six to eight inches from the yellow line and the other located about one and one-half to two feet from the white line. He remembers being in the vehicle under the bridge after the accident, but he could not see because of an injury to his forehead. He described Ms. Murphy as being “hysterical and freaked out.” He felt numb, his face wás sore, and he was having trouble breathing so he “kind oflaid still.”
Emergency personnel were alerted by some people who were at the scene under the bridge. The emergency crews arrived at the scene in order to transport both claimant and Ms. Murphy. Claimant was taken to an area where a medical helicopter flew him to St. Mary’s Hospital in Huntington, Cabell County, because of the severity of his injuries.
Claimant i n this action contends that the respondent was negligent in its maintenance of State Route 49 and the Grapevine Bridge on State Route 49 on the date of the accident described herein above. Claimant asserts that respondent failed to properly maintain the road surface of State Route 49, specifically on the downgrade portion approaching the Grapevine Bridge, and that this failure caused the vehicle in which claimant was a passenger to hydroplane. Further, claimant alleges that respondent failed to replace a portion of the guardrail that was missing on the Grapevine Bridge and that this guardrail would have prevented the vehicle in which he was a passenger on June 26, 1993, from going over the embankment and landing in the area below the bridge, causing him to suffer severe injuries.
Respondent’s position is that the proximate cause of the accident was the failure of the driver to maintain control of her vehicle; the speed of the vehicle at the time of the accident; the action of the claimant in grabbing the steering wheel; and the condition of the tires on the vehicle. As to the issue of the maintenance of the bridge, respondent asserts that the guardrail was not a factor in this claim for two reasons: first, the area where the vehicle in which claimant was a passenger went off the Grapevine Bridge on State Route 49 was an area where the missing guardrail would not have extended; and second, even if the guardrail were present, the accident *320 still would have occurred and the vehicle still would have gone into the ravine resulting in the injuries to the claimant.
This accident was investigated by a member of the West Virginia State Police, Trooper First-Class Michael Allen Smith. At the location in question, Trooper Smith took about thirty photographs of the scene which were admitted into evidence. Statements from the claimant and Ms. Murphy were taken on another occasion by another trooper. Trooper Smith concluded in his Uniform Traffic Accident Report that the driver of the vehicle, Ms. Murphy, was exceeding a safe speed limit due to the fact that she lost control of the vehicle, it was raining, and the surface of the road was wet. He came to this conclusion because there were no observable skid marks and the vehicle had crossed the area over Grapevine Creek and Fork Lick Road before striking the other side of the embankment. Although the speed limit for State Route 49 at this particular location is 55 miles per hour, Trooper Smith acknowledged that there was a difference between the speed limit and a safe speed. He was of the opinion from his observations at the accident scene that Ms. Murphy should have been operating the vehicle at a slower speed. It is his opinion that “a driver has to adjust for any conditions he might encounter. Just because the speed limit is say for instance 55 or 75 on the highway, you know, if safety doesn’t warrant that speed, you shouldn’t go that speed.” Ms. Murphy was not issued a citation by Trooper Smith for this incident. Trooper Smith did not recall seeing any ruts in the road surface of State Route 49. He stated that if he had thought that there was a problem with the road, he would have taken photographs of the area. He was also of the opinion that he would have taken additional photographs of any unusual conditions on the surface of Route 49 if he had noticed these during his investigation. He was of the opinion that he remembered being concerned about all of the area surrounding the accident scene due to the severity of the accident. He was requested to review photographs of the accident scene during his testimony and he made various marks on these photographs including a mark on the a photograph of the hillside where he thought the vehicle struck the hillside before falling into the area beneath the bridge.
The Grapevine Creek Bridge was constructed by respondent in 1961. It is sixty-three feet in length, twenty-three feet five inches in width and has a weight limit of fourteen tons. Since the bridge has a weight limit of less than fifteen tons, it is not a posted bridge. The bridge is suspended about twenty-five feet over Grapevine Creek and Lick Fork Road. Proceeding northbound, the bridge first crosses over Grapevine Creek and then it crosses over Lick Fork Road. A power line is suspended about one-quarter from the southern end of the bridge over Grapevine Creek.
The evidence in this claim establishes that bridges throughout the State of West Virginia are inspected every two to four years in accordance with federal regulations. These inspections are performed by individuals designated as bridge *321 inspectors and reports are written for the specific bridge inspected. Generally, within one month of a bridge inspection, the report is prepared. This report is reviewed by an evaluation engineer who signs it on the first page and by the bridge engineer in the particular district. These reports are then sent to respondent’s office in Charleston. If there is a critical structural problem, the evaluation engineer informs his superior or a supervisor in the area immediately. Otherwise, t he repair process may take longer. For the Grapevine Bridge, Mansour Saber was the evaluation engineer. His focus for the bridge inspection reports is to note any deficiencies in the structure of the bridge, i.e., the underneath of the bridge, the steel, the connection, anything that might indicate that the bridge could fall. Any non-structure related problems such as the condition of the guardrails on the bridge are not within his area of responsibility. The bridge engineer would be the individual in a district to address an issue regarding guardrails.
During the hearing of this claim, four of respondent’s bridge inspection reports dated December 11, 1989; May 16, 1989; May 20, 1991; and June 3, 1993, were admitted into evidence. Each report included photographs of the location in question, and each report indicated that eighteen feet of guardrail on the eastern side of the bridge was missing. Bridge Inspector Johnie Lee Clagg inspected the bridge on December 11, 1989, and noted in his report that a portion of guardrail was missing. His inspection report also noted that as of December 11, 1989, the Grapevine Bridge was not in a safe condition and corrections should be made. During the six years following the December 11, 1989, report, until the date of claimant’s incident, the condition of the bridge remained unchanged even though the average daily travel count increased from 1,900 to 3,300 vehicles by June 3, 1993. Bridge Safety Inspector III, Roger Eugene Chapman, inspected the bridge on June 3, 1993. In that report, he noted that the guardrail was damaged, in critical condition, and should be replaced. However, he could not remember having seen any approach guardrail at this location on the Grapevine Bridge in any of his inspections of the bridge. These reports substantiate the allegation of the claimant that there was guardrail missing on the Grapevine Bridge and that this fact was known by the bridge inspectors who were assigned to inspect this bridge.
According to District II Administrator Wilson Braley, the May 16, 1989, report that indicated the deficiencies on the Grapevine Bridge, including the missing guardrail, created a critical condition on the bridge. He stated that guardrail at the ends of the bridge are flared out and were not attached to the side of the bridge. In addition, he acknowledged that the May 20, 1991, report also mentioned that the guardrail was in critical condition and needed to be replaced.
As the District II Administrator, it was Mr, Braley’s responsibility to assign the work for guardrail repair. If the project was one that would take three to six months to complete, he would obtain a purchase order and hire a contractor to do the project. I n o rder tor eplace the m issing g uardrail o n t he Gr apevine Br idge, M r. *322 Braley testified that two pieces of guardrail should have been sufficient to complete the project. Guardrail usually comes in sections about thirteen feet long to provide coverage for an area of about twelve feet, six inches. Guardrail is connected with vertical posts, often called “lookout posts.” The “lookout posts” are welded to the outside beam of the bridge.
From 1985 to 1987, respondent’s maintenance office in Mingo County stocked guardrail and would have been responsible for its installation. The Mingo County Supervisor, Barry Mullins, testified that he is on State Route 49 on a regular basis, but he did not inspect the bridge for any missing guardrail. He asserted that if he had seen any missing guardrail, he would have had it replaced. He further stated that he would remedy any hazard or danger immediately. Of course, these repairs would be temporary because the Mingo County office does not have the equipment or skill to conduct more permanent guardrail repairs. He stated that once he received notice of an incident, he would make an on-site inspection of the area in question. Evidence adduced at the hearing indicated that the West Virginia Maintenance Manual (1989 edition) states that guardrail inspections are to take place twice per year. Repairs are to be noted on a form in triplicate and. scheduled. Mr. Mullins stated that his office does not have any such form and no such inspection program is in place. Maintenance Assistant Jimmie Messer testified that when guardrail is missing, he would discuss the issue with the County Supervisor and no written records would be made unless there was a complaint. According to Mr. Messer, in 1993, if guardrail was damaged in a few sections, a contractor would do the routine replacement work, but he was not prepared to testify if that extended to bridges.
According to claimant’s expert Dr. Kenneth William Crowley, a highway traffic engineer, if the missing section of the guardrail on the Grapevine Bridge would have been properly maintained, this incident involving the claimant would not have occurred. Dr. Crowley did not visit the site, but he based his calculations on the measurements obtained by Donald Underwood, respondent’s expert in accident reconstruction. Although, Dr. Crowley used these measurements, he opined that the measurements obtained by respondent gave “the illusion of precision.” Moreover, it is Dr. Crowley’s opinion that the purpose of guardrail is to help keep errant vehicles on the road. The presence of guardrail extends the time for vehicular stopping points and reduces the severity of impacts. Dr. Crowley acknowledged that guardrail is a hazard in and of itself, so it is only placed where it is needed.
In order to establish his position, Dr. Crowley calculated two momentum analyses of the incident in question. The concept of “momentum” was defined as weight of a vehicle times the speed of the vehicle times the angle of the vehicle. The weight of the vehicle was estimated at 2,550 pounds, including the vehicle and passengers. First, Dr. Crowley determined the speed of the vehicle. He did this by calculating the distance traveled and the distance dropped based upon the laws of speed and gravity. The speed of the vehicle was estimated between thirty and fifty- *323 three miles per hour. Ms. Murphy testified that the speed of the vehicle was about thirty miles per hour. Claimant testified that the speed of the vehicle was about forty-five miles per hour and Mr. Underwood determined the air speed of the vehicle as it left the edge of the pavement at about fifty-three miles per hour. Dr. Crowley opined that the highest possible speed of the vehicle was fifty- eight miles per hour.
Calculating the angle of impact of the Murphy vehicle with the guardrail was also part of Doctor Crowley’s analysis in this claim. He used impact angles of twenty-five degrees for the first analysis and fifty-three degrees for the second analysis. He determined the angle of impact from tread marks he identified in photographs. It is his opinion that the tire marks on the bridge indicate that the vehicle was going straight and that it was not skidding at the point of impact. The trajectory of the vehicle followed the bridge. If the vehicle had impacted higher on the embankment, the speed would be higher than if the point of impact was lower on the embankment. Based upon his calculation, Dr. Crowley determined that the impact momentum w ould b e 1 ess t han t he w eight o f t he M urphy v ehicle; t herefore, t he presence of guardrail would have contained the Murphy vehicle on impact and directed it back to the road. Dr. Crowley opined that at the top speed of the vehicle, the guardrail would have directed the Murphy vehicle to a safe situation.
At thirty-five miles per hour, Dr. Crowley opined that the vehicle would have struck the base of the embankment. Dr. Crowley also estimated the speed needed to clear the power wire under the bridge at thirty-five miles per hour.
Furthermore, Dr. Crowley defined the action of vehicular hydroplaning as being the involuntarily loss of control by the driver of the vehicle because of water on the road surface. Turning the steering wheel while hydroplaning would not affect control of the vehicle. Dr. Crowley stated that it would be possible for a vehicle to hydroplane with ruts in the road surface. The tire would float in the low spots or ruts in the road. Dr. Crowley was unable to opine whether claimant’s action in grabbing the wheel was prudent because it would depend on the situation. If the pavement had been dry, Dr. Crowley believed that the vehicle would have veered to the left or right.
Since early 1999, respondent’s expert in auto accident reconstruction, Donald Lee Underwood, visited the accident site six times. On three occasions, he and Charles Raymond Lewis, II, a traffic engineer for respondent, searched for a possible point of impact of the Murphy vehicle in the northeastern side of the embankment. In the spring of 2000, Mr. Underwood found what they believed to be physical evidence of the point of impact of the vehicle. Mr. Underwood was climbing on the embankment when he found a small piece of glass in the hillside. It is his opinion that the glass was of the type used for automobile headlights. Therefore, he believed that this was the point of impact for the Murphy vehicle. Mr. Underwood acknowledged that he was not sure if the glass that he found belonged to the Murphy vehicle. Also, Mr. Underwood was unaware of other accidents in the *324 same location and he acknowledged that vegetation had grown up in the area and it is a rocky embankment.
Mr. Underwood used the angles, distances, and elevations based on the glass shard to calculate the point of impact. He also based this point upon a survey of the bridge performed by Roger Newsome, one of respondent’s surveyors, who calculated the elevation by establishing a point on the bridge and measuring to the point of impact on the hillside. The slope was determined to be 61.70 feet and the elevation was determined to be 100 feet. A vertical distance of 8.49 feet was determined from the point where the glass was located in the hillside to the top of the embankment. The 8.94 feet is the difference in elevation from the abutment on the southern wing wall to the point of impact. Using the survey results, Mr.- Underwood then calculated the point of impact of the Murphy vehicle and the speed at which the vehicle was traveling when it left the roadway. Mr. Underwood determined the airborne speed to be fifty-three miles per hour.
As a part of his investigation, Mr. Underwood examined the photographs taken of the scene on the day of the incident. One of the photographs depicts a tire imprint on the abutment. Mr. Underwood opined that this was characteristic of a rolling tire, which he believed indicated no brake application. However, Mr. Underwood was unaware of which tire of the Murphy vehicle if any made the impression. He acknowledged that if in fact the mark was from the passenger side tire, then the Murphy vehicle would have been going slower according to his speed calculation. Mr. Underwood also acknowledged that the speed calculation is sensitive. He estimated a measure of five miles per hour per one foot drop. Mr. Underwood could not precisely pinpoint the point of departure and no measurements were made. In addition, Mr. Underwood testified that photographs of the Murphy vehicle after the incident indicates evidence of tire wear. He could obtain the speed of the vehicle only from its point of departure from the bridge, which he termed the “airborne speed.” Based upon all the factors that he took into consideration, he was of the opinion that the calculation of speed of the Murphy vehicle at fifty-three miles per hour was reasonable and accurate.
ANALYSIS AND CONCLUSIONS OF LAW
The Court desires to first address respondent’s contention that the claimant was somehow negligent in his action if he grabbed the steering wheel in an attempt to prevent an accident. The Court is of the opinion that the facts do not support this contention. The driver of the vehicle stated that she closed her eyes and took her hands off the steering wheel when she felt the vehicle was out of control. The claimant remembers being in a reclined position and having time only to reach for the dashboard before the vehicle was airborne. The Court believes the claimant’s version of his own actions. Accidents occur in milliseconds of time. The driver had her eyes closed as well as being hysterical so it is difficult to believe that she would have been cognizant of what was going on inside the vehicle. Even if her version is *325 to b e b elieved, w ould n ot a reasonable, p indent p erson o bserving t hat t he dr iver released the steering wheel be in a position of feeling forced to grab the steering wheel of the vehicle? Is this not the expected reaction of a passenger in an emergency situation? This Court cannot agree with the position of the respondent. In fact, the sudden emergency doctrine is a viable doctrine under comparative negligence. Moran v. Atha Trucking, Inc., 208 W.Va. 379, 540 S.E.2d 903 (1997). The sudden emergency doctrine defines conduct to be that expected of a prudent person in an emergency situation. The essential element of the sudden emergency doctrine is that a party not have time for reflection. The Court is of the opinion that the doctrine could be, and, in fact, would have been applicable to the claimant herein if the Court had found that the evidence established that the claimant had grabbed the steering wheel in an attempt to gain control of the moving vehicle. However, as previously stated, the Court concludes that the evidence does not support the theory that the claimant is responsible in some way for the accident; therefore, there is no basis for this position of the respondent.
Claimant alleges that the accident began when the vehicle began to hydroplane on State Route 49 because respondent’s negligent maintenance of the surface of State Route 49. The evidence fails to establish that the road surface was the cause of the driver’s loss of control of her vehicle. The photographs taken by Trooper First Class Smith, the investigating officer of the accident, and placed in evidence do not exhibit any unusual road surface conditions. The officer himself explained to the Court that if the road surface had exhibited a condition other than that normally anticipated, he would have noted that fact on his Uniform Traffic Accident Report. He indicated that he also would have taken photographs of any abnormal road condition during his investigation. The Court is of the opinion that Trooper First-Class Smith performed an in-depth investigation of this accident and the Court accepts his statements about the condition of the surface of State Route 49. Therefore, t he C ourt c oncludes that the c ause o f t he dr iver 1 osing c ontrol o f h er vehicle was not the fault of any negligent maintenance of State Route 49.
Therefore, the critical issue to be addressed in this claim is whether or not there was a defective condition having to do with the guardrail and whether respondent had notice of this defect and a reasonable time to repair it. The claimant bases the crux of his claim upon the fact that a section of missing guardrail on the Grapevine Bridge constitutes actionable negligence on the part of respondent. The well-established principle of law in West Virginia is that the State is neither an insurer nor a guarantor of the safety of travelers upon its roads. Adkins vs. Sims, 130 W.Va. 645; 46 S.E.2d 81 (1947). In order to hold respondent liable for road defects of this type, a claimant must prove that respondent had actual or constructive notice of the defect and a reasonable time to take corrective action. Chapman vs. Dept. of Highways, 16 Ct. Cl. 103 (1986). When the condition of a bridge should have been anticipated by respondent, its failure to maintain the bridge properly constitutes *326 negligence. Eller vs. Div. of Highways, 13 Ct. Cl. 155 (1980). This Court has also held that respondent does have a duty to maintain existing guardrail or replace missing guardrail on bridges in a timely manner. Woody vs. Dept. of Highways, 18 Ct. Cl.29 (1989). In Shabdue vs. Sims, the Court held that the State’s failure to properly repair and maintain the floor, railing, and guardrail of a bridge in a reasonably safe condition constituted negligence. 142 W. Va. 805, 98 S.E.2d 433 (1957).
The evidence in this claim clearly establishes that the guardrail on the Grapevine Bridge was defective; that respondent had actual notice of the missing guardrail; and that respondent had a reasonable time in which to effect repairs. The respondent’s bridge inspection reports clearly demonstrate that there was eighteen feet of guardrail missing on the eastern side of the bridge. From the date of the first available bridge inspection report, dated May 16, 1989, there were notations that the guardrail and handrail are in critical condition and that railing should be replaced. The evidence in this claim clearly established that as of December 11, 1989, the Grapevine Bridge was not in a safe condition and that it should have been corrected. This was some three and a half years prior to the accident which is the subject matter of this claim. Subsequent reports reiterate that an eighteen foot section of guardrail was missing from the upstream side at abutment number one.
Furthermore, the Mingo County Maintenance Office also had at least constructive notice, if not actual notice of the missing guardrail on the Grapevine Bridge and failed to take any action whatsoever to remedy the situation. Certainly respondent’s employees frequently traveled State Route 49 during routine road inspections which necessitated their driving across the Grapevine Bridge.
The Court is of the opinion given the testimony that the respondent had actual notice of the damaged and missing guardrail on the Grapevine Bridge, and respondent had more than a reasonable time to repair to make the appropriate repairs. Respondent knew or should have known that the failure to replace the guardrail presented a hazard to the traveling public. As respondent’s employees were in agreement that the guardrail should have been replaced; that this condition posed a hazard to the traveling public; and, that the purpose of the guardrail is to deflect traffic on an errant path on the roadway, the Court concludes that the failure to act on the part of the respondent is inexcusable and an act of gross negligence.
However, the crux of this case is the proximate cause of the accident and subsequent injuries to the claimant. The law in West Virginia requires that a finding of negligence, in and of itself, is insufficient to find liability on a party. To constitute actionable negligence there must be a finding that the negligence was the proximate cause of the injuries to the complaining party. Roush vs. Johnson, 139 W. Va. 607; 80 S.E.2d 857 (1954); Matthews vs. Cumberland & Allegheny Gas Co. 138 W. Va. 639, 77 S.E.2d 180. (1953). This issue rests upon whether or not the negligence of the respondent in failing to replace this missing guardrail was the proximate cause of the *327 accident. If the Court finds that the injuries to the claimant would not have occurred but for the negligence of the respondent, then a recovery on behalf of the claimant would be in order. The testimony of claimant’s expert, Dr. Kenneth Crowley, would have the Court enter into the world of speculation. According to Dr. Crowley, if the guardrail had been in place, if the vehicle struck the guardrail at a particular angle, and if t he g uardrail w ere o f s uch a nd s uch a s trength, t hen t he v ehicle in w hich claimant was a passenger would not have gone airborne, struck the hillside on the north side of the Grapevine Bridge, and would not have dropped into the bottom of a ravine causing injuries to the claimant. What would have happened to the vehicle if it had struck a guardrail, of course, cannot be answered. This Court, in its determinations of many claims previously heard and submitted for decision, has declined to speculate in order to find liability upon a respondent State agency. Mooney vs. Department of Highways, 16 Ct. Cl. 84 (1986); Phares vs. Division of Highways, 21 Ct. Cl. 92 (1996).
The Court is constrained by the time-honored principle of law that the preponderance of the evidence must establish that the negligence of the respondent is the proximate cause of the injuries to the complaining party for there to be a recovery. It is the opinion of the Court in the claim herein that the preponderance of the evidence does not support a finding that the negligence of the respondent was the proximate cause of the accident that resulted in the serious injuries suffered by the claimant. The proximate cause of the accident herein was the driver error committed when the driver failed to maintain control of her vehicle. At that point, the existence or non-existence of the guardrail, even if the missing 18-foot section would have covered the area where the vehicle went off the paved portion of the road, becomes a moot issue. Who can say what would have happened at that juncture of the on-going action of the vehicle? What if the vehicle struck the guardrail head on and flipped over? Would both occupants be alive today? Would they have suffered no injuries? This Court declines to speculate as to what could or would have happened. It cannot answer these questions to its satisfaction. Therefore, the Court concludes that the proximate cause of the accident in this claim is driver error, and not negligence on the part of the respondent.
The Court is most cognizant of the severity of the injuries to the claimant, and the Court is most sympathetic with the plight of the claimant. Claimant Jeremy Tait Hunt appears to the Court to be a young man who is determined to accept his physical 1 imitations a nd t o 1 ive h is 1 ife to t he f ullest. T he C ourt h as t he u tmost respect and admiration for this young man. However, the Court cannot speculate to the degree required in this claim that the severe and permanent injuries he suffered in this accident were proximately caused by the negligence of the respondent. Thus, the Court is required by the applicable law to hold that there may be no recovery on the part of the claimant in this claim.
*328 In accordance with the finding of facts and the conclusions of law as stated herein above, the Court is of the opinion to and does deny this claim.
Claim disallowed.

 Since the incident in question, Celia Michelle Murphy has married and her name has changed to Celia Michelle Stumbo. The Court will refer to this witness using her maiden name.